IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRET A. EVANS, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| 1) SELECT PORTFOLIO SERVICING, INC.; and | |
| 2) U.S. BANK, N.A. AS TRUSTEE FOR THE J.P. MORGAN ACQUISITION TRUST 2006-WMC4 ASSET BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-WMC4, | |
| Defendants | |

## CLASS ACTION COMPLAINT

1.       Plaintiff, Bret A. Evans, individually and on behalf of all others similarly situated,

brings this class action against defendant Select Portfolio Servicing, Inc., ("SPS"), the servicing

agent for his residential mortgage loan, and defendant U.S. Bank, N.A. as Trustee for the J.P.

Morgan Mortgage Acquisition Trust 2006-WMC4 Asset Backed Pass-Through Certificates,

Series 2006-WMC4 ("U.S. Bank"), the identified "owner" of Plaintiff Evans's residential

mortgage loan.   Defendants have engaged in unlawful and deceptive acts, practices and

misconduct in connection with the ownership and servicing of residential mortgage loans,

including, but not limited to, (i) making representations that late fees will be charged, and

charging late fees, after acceleration of the Class members' loans, which is prohibited by the

standard form mortgage agreement and the laws of the State of New York and other states,

including, but not limited to, New Jersey, Pennsylvania, Massachusetts, Vermont and California;

and (ii) charging excessive and unreasonable inspection fees despite occupancy, which is in

violation of the standard form mortgage agreement and Fannie Mae industry guidelines and regulations.  In addition, SPS, the servicing agent, has violated RESPA, 12 U.S.C. § 2605(e) by failing to timely and adequately respond to Plaintiff's and borrowers' Qualified Written Requests concerning improper late fees and failing to take corrective action.

## THE PARTIES

2.     Plaintiff Bret A. Evans is the owner of residential property located at 26 Cheviot Road, Southampton, New York 11968 (the "Evans Property").  On September 28, 2006, Plaintiff Evans obtained a residential mortgage loan from WMC Mortgage Corp. for the Evans Property, a copy of which is attached as Exhibit A hereto.  Thereafter, Chase Home Finance LLC became the servicer for Plaintiff Evans's residential mortgage loan.   In 2009, a foreclosure action was commenced against Plaintiff Evans in the New York Supreme Court for Suffolk County, and on November 29, 2017 a previously-granted Judgment of Foreclosure in favor of U.S. Bank was vacated by Order of that state court.  On June 1, 2013, SPS became the servicing agent for Plaintiff Evans's mortgage loan.

3.     Defendant Select Portfolio Servicing, Inc. ("SPS") is a residential loan servicing company with headquarters located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119. As of March 31, 2016, SPS serviced more than 400,000 loans nationwide.  SPS enters into service agreements with lenders and note holders pursuant to which SPS provides servicing and agency activities for loan portfolios.  Pursuant to its agreements with U.S. Bank, SPS (a) acts as the agent of defendant U.S. Bank, the lender and/or note holder, and (b) exercises the rights and responsibilities of defendant U.S. Bank, the lender and/or note holder as set forth in Plaintiff's mortgage agreements and SPS's agreements with U.S. Bank, pursuant to the approval, authority and control of defendant U.S. Bank,  the lender and/or note holder.  SPS represents in standard,

2

form letters to borrowers that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument." SPS mails standard, form mortgage statements and notice letters to Plaintiff and Class members with the approval and authority of U.S. Bank.

4.     Defendant U.S. Bank, N.A. as Trustee for the J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 Asset Backed Pass-through Certificates, Series 2006-WMC4 ("U.S. Bank") is located at 209 S. LaSalle Street, Suite 300, Chicago, Illinois 60604. U.S. Bank is headquartered at 425 Walnut Street, Cincinnati, Ohio 45202.  U.S. Bank provides commercial, personal and business banking services.  U.S. Bank is identified by SPS in a July 6, 2018 letter to Plaintiff as the "owner" of Plaintiff's loan and account.   U.S. Bank is also the identified as the owner of Plaintiff's residential loan in the foreclosure action pending the New York State court.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of Title 28 of the United States Code).

6.     Plaintiff is a citizen of a different state than at least one Defendant.  Plaintiff Evans is a citizen and resident of New York.  Defendant SPS is a citizen of Utah, and Defendant U.S. Bank is a citizen of Ohio.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the Class.

7.     This Court has jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in New York, are regularly doing or did business in New York during the relevant time period and have registered with the New York Secretary of State, or do sufficient business in New York, have sufficient minimum contacts with New

York, or otherwise intentionally avail themselves of the New York financial, real estate and consumer markets.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

8.     This Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the Class members are aggregated.  28 U.S.C. § 1332(d)(6).

9.     This Court also has subject matter jurisdiction under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"), the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2605, 28 U.S.C. § 1331, and 28 U.S.C. § 1337.  The Court has supplemental jurisdiction over Plaintiff's and the Classes' state and common law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because the property subject to Plaintiff's residential mortgage loan is located within this District, Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Eastern District of New York.

11.     All conditions precedent to this action have occurred, been performed, or have been waived.

## STATEMENT OF FACTS

### As U.S. Bank's Servicing Agent, SPS Charges Late Fees Post-Acceleration

12.     On September 28, 2006, Plaintiff Evans obtained a residential mortgage loan from WMC Mortgage Corp. for the Evans Property.  Plaintiff Evans's mortgage is a Fannie Mae/ Freddie Mac Uniform Instrument.  Thereafter, ownership of the loan was transferred to U.S. Bank.  In 2009, Plaintiff Evans's loan was accelerated and all amounts owed became immediately due and payable.  On June 1, 2013, SPS became the servicing agent for Plaintiff Evans's mortgage loan.

13.     Because Plaintiff's loan had been accelerated prior to SPS becoming the servicer, no late fees could lawfully be imposed or collected by SPS, operating as U.S. Bank's agent, unless specifically authorized by the mortgage agreement.  Plaintiff's standard form mortgage agreements do not permit the charging and collection of late fees post-acceleration.

14.     Despite acceleration of the Plaintiff's loan, Defendant SPS, operating as U.S. Bank's agent, falsely represented that late fees could and would be charged to Plaintiff's loan if Plaintiff failed to make payments in full by a date certain.

15.      On April 12, 2018, Defendant SPS mailed a standard form mortgage statement to Plaintiff Evans which stated that, "This account has been accelerated, which means that all outstanding amounts are due."  The SPS April 12, 2018 mortgage statement further stated, "If payment is received after May 16, 2018, $75.99 late fee will be charged."  That mortgage statement indicated that there were "unpaid late charges" of $835.89 and "other charges and fees" of $9,506.00.

16.     On April 30, 2018, Plaintiff Evans sent SPS a Qualified Written Request ("QWR") pursuant to RESPA, 12 U.S.C. § 2605(e)(1)(B), requesting, among other things, that

SPS provide him with a detailed payment history and an accounting showing, *inter alia*, the total amount of late fees that were charged to his mortgage account as well as an accounting for the "other charges and fees in the amount of $9,506.00." Plaintiff Evans also requested that SPS provide him with the 30-day default notice and date of default.

17.     In response, SPS wrote to Plaintiff Evans on May 14, 2018, stating, in relevant part, "Late fees are assessed according to the requirements found in your Adjustable Rate Note and state law. If the fee is allowed under the Adjustable Rate Note and state law, a late fee may be assessed if we do not receive your monthly payment prior to the expiration of any applicable grace period. The late fee amount and grace period are outlined on the first page of your Periodic Statement." However, U.S. Bank and SPS, operating as U.S. Bank's agent, knew, or reasonably should have known, and failed to disclose that assessing a late fee post-acceleration is not permitted by Plaintiff's mortgage, a Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, and is not allowed under the laws of New York and other states, including, but not limited to, New Jersey, Pennsylvania, Vermont, Massachusetts, and California.

18.     Plaintiff Evans's mortgage states, in relevant part:

22. Lender's Rights if Borrowers Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. The requirement is called "Immediate Payment in Full."

        Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;
(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2)  The action that I must take to correct that default;

(3) A date by which I must correct the default.  That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may required Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

19.     There is thus no provision in Plaintiff Evans's standard form mortgage agreement which permits SPS to charge or collect a late fee post-acceleration, whether for itself or on behalf of U.S. Bank or any other lender or note-holder.

20.     Nevertheless, SPS, operating as U.S. Bank's agent, continued to assess Plaintiff Evans a monthly late fee.  On May 3, 2018, SPS mailed Plaintiff Evans a PAYOFF STATEMENT which represented $835.89 in "Late Charges Outstanding."

21.     On May 15, 2018, SPS mailed a standard form mortgage statement to Plaintiff Evans which stated that, "This account has been accelerated, which means that all outstanding amounts are due."   That May 15, 2018 mortgage statement further stated, "If payment is received after June 16, 2018, $75.99 late fee will be charged."

22.     On June 14, 2018, SPS mailed a standard, form mortgage statement to Plaintiff Evans which stated that, "This account has been accelerated, which means that all outstanding amounts are due."   That June 14, 2018 mortgage statement further stated, "If payment is received after July 16, 2018, $75.99 late fee will be charged."

23.     This is not the first time SPS's representations to consumers in standardized, written loan servicing communications have been the subject of litigation.  In September 2007, SPS was permanently restrained and enjoined from, among other things, the following:

> D. "Misrepresenting, expressly or by implication, any amount that a consumer owes;  E. Misrepresenting, expressly or by implication, that any fee is allowed under the loan instruments, permitted by law, or  imposed for services actually rendered.

*See United States v. Select Portfolio Servicing, Inc.*, 2007 U.S. Dist. LEXIS 104230, at *9 (D. Mass. Sept. 6, 2007).

24.     On July 5, 2018, Plaintiff Evans mailed SPS a second QWR, which placed SPS on further notice that Plaintiff Evans believed the late fees which had been charged and imposed by U.S. Bank and SPS to his mortgage balance post-acceleration were improper.  Plaintiff Evans requested that the monthly late fees, including the most recent late fee of $75.99, which SPS represented in the June 14, 2018 mortgage statement would be charged if payment was not received by July 16, 2018, be removed and that SPS refrain from charging monthly late fees to Plaintiff Evans's mortgage account.

25.     On August 3, 2018, SPS wrote to Plaintiff Evans in response to his July 5, 2018 QWR.  SPS stated it "received your correspondence dated 07/05/2018.  We are in the process of completing our research of the issue(s) identified in your letter and expect to provide a response to you within the next thirty (30) days."  SPS, however, failed to provide a response, or take corrective action, within thirty days.

### Operating As U.S. Bank's Servicing Agent SPS Charged Inspection Fees Neither Reasonable Nor Appropriate To Protect U.S Bank's Interest

26.     In its May 14, 2018 response to Plaintiff Evans, SPS also stated that, "[a]s a mortgage servicer, SPS may incur fees or costs, that are necessary to protect the noteholder's

interests in a property and are allowed under the terms of your Mortgage documents.  These fees or servicer advances appear on your monthly statement as 'other Charges and Fees.'"  This statement was materially false and misleading.  Many of the fees charged were neither reasonable nor appropriate to protect the noteholders interest in the property, nor allowed by Plaintiff Evans's standard form mortgage or note agreements.

27.     For example, SPS charged and imposed on Plaintiff Evans monthly inspection fees, and sometimes charged multiple monthly inspection fees and multiple inspections on the same day, despite being in contact with Plaintiff Evans and having knowledge that the property was occupied.  Indeed, a standardized fee schedule for Plaintiff Evans's mortgage stated that a property inspection fee would be charged only, "if you are in default and we can not make contact with you to determine the condition of the property."  However, SPS was able to make contact with Plaintiff Evans, knew the property was occupied, and nevertheless charged monthly inspection fees that were neither reasonable nor appropriate to protect the lender's interest in the property.  U.S Bank has also been in regular contact with Plaintiff and his foreclosure legal counsel in connection with a mortgage foreclosure action pending in the New York State courts since 2009.

28.     Plaintiff Evans's mortgage provides the following with respect to inspections:

> 7. Borrower's Obligation to Maintain and Protect That Property And to Fulfill Any Lease Obligations.
>
> (a) Maintenance and Protection of the Property.  I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.  Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. . . .
>
> (b) Lender's Inspection of Property. Lender, and others authorized by Lender, may enter on and inspect the Property.  They will do so in a reasonable manner and at reasonable times.

29.     Plaintiff Evans's mortgage further provides:

9. Lender's Right to Protect its Rights in The Property:  If: (a) I do not keep my promises and agreements made in this Security Instrument. . . or (c) I have abandoned the Property, then Lender may do and pay for whatever is **reasonable or appropriate** to protect Lender's interest in the Property and Lender's rights under this Security Instrument. Lender's actions may include, but are not limited to:  (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property;  . . .

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9.  (Emphasis added).

30.     As a loan servicer, SPS is required to follow the servicing guidelines of Fannie Mae.  Failure to comply with these guidelines is probative of a failure on the part of the loan servicer to comply with state consumer protection laws.  Moreover, the Fannie Mae servicing guidelines clarify what is "reasonable or appropriate" under the mortgage agreement.

31.     With respect to property inspections, Section 303 of the 2015 Fannie Mae Servicing Guidelines provide:

Generally, the servicer does not have to inspect a property that secures a delinquent mortgage loan if it has established [Quality Right Party Contact ("QRPC")] with the borrower and is working with the borrower to resolve the delinquency … or a full payment has been received within the last 30 days.

The servicer must order the property inspection by the 45th day of delinquency and complete the property inspection no later than the 60th day of delinquency if QRPC has not been achieved or a full payment has not been received within the last 30 days. The servicer must continue to obtain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more delinquent.

32.     Section 303 of the 2015 Fannie Mae Servicing Guidelines is necessary to ensure the property is occupied when a loan servicer has been *unable to establish contact with the borrower* and loan payments have not been received.  But Section 303 does not authorize or permit inspections when the loan servicer is in contact with the borrower and knows the property to be inhabited, such as when the borrower provides a notice of occupancy to the loan servicer, or after the borrower has come current.

33.     As detailed herein, Plaintiff and other members of the Class have been in contact with SPS and U.S. Bank and/or have provided notice of occupancy forms, have achieved QRPC

under the Fannie Mae Servicing Guidelines, and/or have become current on their loans and were no longer in default. Yet, SPS, operating as U.S. Bank's agent, ordered property inspections, which were charged to Plaintiff's and the Class members' mortgage balances, without a legitimate basis, solely to generate unreasonable and unnecessary fees.

34. In addition, the United States Department of Housing and Urban Development imposes a limitation on loan servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377 provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, **and efforts to reach the mortgagor by telephone within that period have been unsuccessful,** the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part. (Emphasis added).

35. Upon information and belief, SPS utilizes a software-based servicing system which automatically orders property inspections, and charges the borrower's account for the inspections, if a borrower is in default. The only criteria for the inspection to be ordered and charged is that the loan has been in default for a certain number of days. The inspection is ordered and charged regardless of whether there is a lawful and reasonable basis for ordering the inspection or whether the borrower may be legally charged for the inspection.

36. SPS and its automated servicing system, intentionally ignores whether Class members, including Plaintiff, are living in their homes at the time of the inspections, have provided proof of occupancy, or otherwise have been in contact with SPS by telephone or written correspondence.

37.     The unwarranted charging of inspection fees allows SPS, operating as U.S. Bank's agent, to reap huge profits for itself and/or its principle at the cost of the Plaintiff and the other Class Members.

38.     For instance, Plaintiff Evans's mortgage account was charged regular monthly inspection fees by SPS as set forth below despite his being in contact with U.S. Bank and SPS during this period and occupying the property. The inspection fees totaled over $1,200. Moreover, on a single day, June 14, 2013, SPS, operating as U.S. Bank's agent, charged 29 separate inspection fees, ranging in amounts of $14, $56 and $60:

| June 14, 2013 | $14 Inspection Fee |
|---|---|
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $60 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $60 Inspection Fee |
| June 14, 2013 | $60 Inspection Fee |
| June 14, 2013 | $60 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |

| | |
|---|---|
| June 14, 2013 | $60 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $56 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| June 14, 2013 | $14 Inspection Fee |
| August 13, 2013 | $15 Inspection Fee for "Property Preservation" |
| October 2, 2013 | $15 Inspection Fee for "Property Preservation" |
| November 7, 2013 | $15 Inspection Fee for "Property Preservation" |
| December 19, 2013 | $15 Inspection Fee for "Property Preservation" |
| January 30, 2014 | $15 Inspection Fee for "Property Preservation" |
| March 7, 2014 | $15 Inspection Fee for "Property Preservation" |
| April 23, 2014 | $15 Inspection Fee for "Property Preservation" |
| June 2, 2014 | $15 Inspection Fee for "Property Preservation" |
| July 10, 2014 | $15 Inspection Fee for "Property Preservation" |
| August 21, 2014 | $15 Inspection Fee for "Property Preservation" |
| October 29, 2014 | $15 Inspection Fee for "Property Preservation" |
| December 1, 2014 | $15 Inspection Fee for "Property Preservation" |
| January 2, 2015 | $15 Inspection Fee for "Property Preservation" |
| February 12, 2015 | $15 Inspection Fee for "Property Preservation" |
| April 14, 2015 | $15 Inspection Fee for "Property Preservation" |
| May 20, 2015 | $15 Inspection Fee for "Property Preservation" |
| June 23, 2015 | $15 Inspection Fee for "Property Preservation" |

| | |
|---|---|
| July 29, 2015 | $15 Inspection Fee for "Property Preservation" |
| September 1, 2015 | $15 Inspection Fee for "Property Preservation" |
| October 9, 2015 | $15 Inspection Fee for "Property Preservation" |
| November 18, 2015 | $15 Inspection Fee for "Property Preservation" |
| December 23, 2015 | $15 Inspection Fee for "Property Preservation" |
| January 27, 2016 | $15 Inspection Fee for "Property Preservation" |
| March 1, 2016 | $15 Inspection Fee for "Property Preservation" |
| April 20, 2016 | $15 Inspection Fee for "Property Preservation" |
| June 24, 2016 | $15 Inspection Fee for "Property Preservation" |
| September 30, 2016 | $15 Inspection Fee for "Property Preservation" |
| December 2, 2016 | $15 Inspection Fee for "Property Preservation" |
| January 6, 2017 | $15 Inspection Fee for "Property Preservation" |
| February 7, 2017 | $15 Inspection Fee for "Property Preservation" |
| March 15, 2017 | $15 Inspection Fee for "Property Preservation" |
| April 19, 2017 | $15 Inspection Fee for "Property Preservation" |
| May 23, 2017 | $15 Inspection Fee for "Property Preservation" |
| June 26, 2017 | $15 Inspection Fee for "Property Preservation" |
| August 28, 2017 | $15 Inspection Fee for "Property Preservation" |
| October 3, 2017 | $15 Inspection Fee for "Property Preservation" |
| December 19, 2017 | $15 Inspection Fee for "Property Preservation" |

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2) and (b)(3) on behalf of a Class defined as follows:

All borrowers who have mortgage agreements on loans serviced by SPS for U.S. Bank, and during the relevant statutes of limitation periods:

(a) have had late fees charged post-acceleration,

14

(b) have had inspection fees charged, despite borrower contact and/or occupancy; or

(c) have sent a QWR to SPS concerning late fees charged post acceleration and have not received a timely or adequate response, including SPS's failure to take corrective action.

40.     Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

41.     Defendants subjected Plaintiff and Class members to the same or substantially similar unfair, unlawful, and deceptive practices and harmed them in the same manner.

**Numerosity**

42.     The proposed Class is so numerous that joinder of all members would be impracticable.  As of March 2016, SPS serviced 409,347 loans.  The individual Class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.   The precise number of Class members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**Commonality**

43.     There are questions of law and fact that are common to Plaintiff's and Class members' claims.

44.     These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

    a.  whether Defendants misrepresented that late fees could be charged on loans post-acceleration;

    b.  when SPS was operating as an agent for its principle, U.S. Bank

    c.  whether U.S. Bank gave authority and approval to SPS's representations in standard mortgage statements that late fees could be charged on loans post-acceleration;

    d.  whether Defendants charged late fees on loans post-acceleration;

    e.  whether Defendants charged unreasonable inspection fees in violation of Fannie Mae industry guidelines and regulations;

    f.  whether Defendants' actions are in breach of the standard form mortgage agreements of Plaintiff and the other members of the Class;

    g.  whether SPS violated the FDCPA;

    h.  whether SPS violated RESPA 12 U.S.C. § 2605(e)(1) and (2);

    i.  whether Plaintiff and the Class have suffered damages as a result of Defendants' actions and the amount thereof; and

    j.  The appropriate remedies to be imposed on Defendants for their violations of the laws claimed herein;

**Typicality**

45.    Plaintiff is a member of the Class he seeks to represent. Plaintiff's claims are typical of claims of the other class members because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' unlawful conduct.

**Adequacy of Representation**

46.    Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to

represent him.  There is no hostility between Plaintiff and the unnamed Class members.

Plaintiff anticipates no difficulty in the management of this litigation as a class action.

47.     To prosecute this case, Plaintiff has chosen the undersigned law firms, who are experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**Requirements of Fed. R. Civ. P. 23(b)(3)**

48.     The questions of law or fact common to Plaintiff and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed class members are based on Defendants' materially false and misleading statements concerning late fees and inspection fees and charging of such fees in violation of the standard form mortgage agreements, the laws of New York and other states, including, but not limited to, New Jersey, Pennsylvania, Massachusetts, Vermont and California, and the Fannie Mae industry guidelines and regulations.

49.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

50.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is the case at bar, common questions will be held to predominate over individual questions.

**Superiority**

51.     A class action is superior to individual actions.

52.     Joinder of all Class members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

53.     Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

54.     There are no known individual Class members who are interested in individually controlling the prosecution of separate actions.

55.     The interests of justice will be well served by resolving the common disputes of potential Class members in one forum. Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

**Requirements of Fed. R. Civ. P. 23(b)(2)**

56.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the class.

57.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**(Against All Defendants)**

58.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

59.     Plaintiff and the other members of the Class have executed standard form residential mortgage agreements owned by U.S. Bank and serviced by SPS, as the agent of U.S. Bank.

60.     Defendants have breached the terms of the standard form mortgage agreements by (i) charging late fees after acceleration not permitted by the loan agreements, and/or (ii) charging inspection fees, despite occupancy, which is prohibited by the loan agreements and the Fannie Mae industry guidelines and regulations.

61.     Plaintiff and the other members of the Class have been damaged as a direct result of Defendants' breach. Those damages comprise the wrongful charges added to their mortgage account balances, whether paid voluntarily or ultimately obtained by Defendants through foreclosure proceedings. The application of unlawful charges to Plaintiff's loan balance necessarily increased the total balance, and this accumulation of debts may reduce equity, affect credit ratings, limit borrowing capacity, or otherwise cause a concrete injury to Plaintiff, even if Plaintiff never actually pays the debt accumulated, perhaps due to foreclosure or bankruptcy.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against All Defendants)

62.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

63.     Plaintiff and the other members of the Class have executed standard form residential mortgage agreements owned by U.S. Bank and serviced by SPS, as the agent of U.S. Bank.

64.     A covenant of good faith and fair dealing is implied in every contract, including the standard form mortgage agreements of Plaintiff and the other members of the Class. This

covenant imposes upon each party a duty of good faith and fair dealing in the performance of the contract

65.   Where an agreement affords one part the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

66.   The standard form mortgage agreement of Plaintiff and the other members of the Class permit the lender to take actions reasonable and appropriate to protect its interest in the underlying property, and to charge the borrower for the cost thereof. U.S. Bank and SPS, acting as U.S. Bank's agent, are thus afforded substantial discretion in taking actions reasonable and appropriate to protect the lender's interest in the property. However, Defendants must exercise this discretion in good faith, which they have not done by imposing improper late fees and inspection fees.

67.   U.S. Bank and SPS, acting as U.S Bank's agent, breached the implied covenant of good faith and fair dealing and exercised their discretion under the standard form mortgage agreement in bad faith by, *inter alia*, (a) charging Plaintiff and other members of the Class late fees post-acceleration; and (b) charging Plaintiff and other members of the Class inspection fees once the loan was in default, despite their being in contact with the Plaintiff and other Class members and the occupancy of the property. Neither of these actions was reasonable or appropriate to protect the lender's interest in the underlying property and was undertaken purely to generate additional profits for Defendants.

68.   As a direct and proximate result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT
### (Against Defendant SPS)

69.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

70.     SPS is a debt collector.  SPS regularly collects defaulted debts for others and the debts are in default when SPS first becomes involved with collections.

71.     The Fair Debt Collection Practices Act, 15 U.S.C. § 1692(e) provides, in relevant part:

False or misleading representations

A debt collector may not use any false, deceptive or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(2)     The false representation of –

(A)  the character, amount, or legal status of any debt; . . .

(5)     The threat to take any action that cannot legally be taken or that is not intended to be taken. . .

(10)  The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer . . .

72.     SPS's representations to Plaintiff and other members of the Class in standard form notices that late charges may be imposed on a loan that has been accelerated is false and violates the FDCPA.

73.     As a result of SPS's violations of the FDCPA, Plaintiff and the Class seek actual and statutory damages, in addition the payment of attorneys' fees and reasonable expenses.

## FOURTH CAUSE OF ACTION
### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
### (Against All Defendants)

74.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

75.     Plaintiff brings this cause of action individually and on behalf of a New York Subclass against all Defendants comprising all Class members whose properties subject to the mortgages owed by U.S Bank and serviced by SPS are located within the State of New York.

76.     Plaintiff and the Class members are "persons" within the meaning of GBL §349(h).

77.     GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

78.     U.S. Bank's and SPS's acts and practices, which were undertaken in its capacity as an agent for, and  pursuant to the approval, authority and control of, U.S. Bank, alleged herein constitute acts, uses, or employment by SPS and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of defendants in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

79.     U.S Bank's and SPS's conduct, which was undertaken in its capacity as an agent for, and pursuant to the approval, authority and control of, U.S. Bank, is deceptive because it is likely to mislead consumers and the public by making them believe, falsely, that late fees can and will be charged on accelerated loans in New York if payment is not made in full by a date

certain.  Indeed, SPS represented to Plaintiff and other members of the New York Subclass in standard form letters that it would charge a late fee if payment was not made by a date certain. SPS's representation was materially false and misleading and likely to deceive the consuming public because SPS knew, or reasonably should have known, and failed to disclose, that New York law did not permit late fees to be charged and collected on loans that had been accelerated, absent an explicit provision in the mortgage agreement permitting late fees to be charged post-acceleration.

80.     In addition, SPS, acting as U.S. Bank's agent, charged monthly inspection fees – and sometimes charged for multiple inspections on the same day- to the mortgage accounts of Plaintiff and other members of the Class, despite occupancy and/or contact with the borrower in violation of the Fannie Mae regulations.  In so doing, SPS impliedly represented that such fees were lawful, when they were not.

81.     The deceptive acts and practices of U.S. Bank and SPS, which were undertaken in its capacity as an agent for, and pursuant to the approval, authority and control of, U.S. Bank, have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the New York Subclass.  Indeed, SPS's false and deceptive representations caused Plaintiff and other members of the New York Subclass to suffer damages, including, but not limited to, incurring out of pocket expenses either in an attempt to pay for, or challenge the imposition of, the late fees post- acceleration and inspection fees.

82.     In addition to pecuniary losses, Plaintiff and the Subclass suffered actual harm as a result of Defendants' violations GBL §349(a), including but not limited to, the annoyance, harassment, time, frustration, anger, and anxiety incurred by Plaintiff and the New York Subclass due to Defendants' violations of GBL §349.

83.     Plaintiff and the New York Subclass are entitled to pursue claims against Defendants for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL §349(h) to redress Defendants' violations of GBL §349(a).

84.     New York Subclass members who were sixty-five years of age or older at the time of Defendants' violations of GBL §349 are entitled to pursue additional remedies pursuant to GBL §349-c to redress Defendants' violations of GBL §349(a) perpetrated against elderly persons.

85.     Plaintiff has no adequate remedy of law.

### FIFTH CAUSE OF ACTION
**VIOLATIONS OF CONSUMER PROTECTION LAWS
OF STATES ADDITIONAL TO NEW YORK
(Against All Defendants)**

86.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

87.     In the event that the New York GBL § 349 does not provide redress to Plaintiff's and/or other Class members' claims against Defendants, the following alternative consumer protection statutes provide a basis for redress based on Defendants' unfair, deceptive, and/or misleading acts, practices and conduct in charging late fees post acceleration and inspection fees, despite occupancy and contact with homeowner, in other states, including, but not limited to, New Jersey, Pennsylvania, Massachusetts, Vermont and California (the "Deceptive Practices Subclass"):

a.      The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

b.      The Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A;

c.      The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*

d.      The Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1, *et seq.*; and

e.      The Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

88.      Plaintiff and the Deceptive Practices Subclass have been injured as a direct and proximate result of Defendants' violations of the state consumer protection laws recited in this Count.

89.      Plaintiff and the Deceptive Practices Subclass have suffered and incurred actual damages as a direct and proximate result of Defendants' violations of the state consumer protection laws recited in this Count.

90.      To the extent required to state a claim under any statute listed in this Count, Plaintiff and the Deceptive Practices Subclass reasonably relied on Defendants' misrepresentations, unfair and deceptive statements, material omissions.

91.      Defendants' unfair and deceptive acts were knowing, willful and/or reckless.

92.      Plaintiff and the Deceptive Practices Subclass seek damages, statutory damages, exemplary damages, punitive damages, an injunction, restitution, disgorgement attorney's fees and costs, and all other appropriate legal and equitable relief and remedies for Defendant's violations of the state consumer protection laws recited in this Count.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF RESPA, 12 U.S.C. § 2605**
**(Against Defendant SPS)**

93.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

94.     SPS is a servicer of a federally related mortgage loan, including Plaintiff Evans's mortgage on his residential property located at 26 Cheviot Road, Southampton, New York 11968.

95.     On April 30, 2018, Plaintiff Evans sent SPS a Qualified Written Request ("QWR") pursuant to RESPA 12 U.S.C. § 2605(e)(1)(B), requesting, among other things, that SPS provide him with detailed payment history and an accounting showing, *inter alia*, the total amount of late fees that were charged to his mortgage account as well as an accounting for the "other charges and fees in the amount of $9,506.00." Plaintiff Evans also requested that SPS provide him with the 30-day default notice and date of default.

96.     In response, SPS wrote to Plaintiff Evans on May 14, 2018, stating, in relevant part, "Late fees are assessed according to the requirements found in your Adjustable Rate Note and state law. If the fee is allowed under the Adjustable Rate Note and state law, a late fee may be assessed if we do not receive your monthly payment prior to the expiration of any applicable grace period. The late fee amount and grace period are outlined on the first page of your Periodic Statement." However, SPS knew, or reasonably should have known, and failed to disclose that assessing a late fee post-acceleration is not permitted by Plaintiff's mortgage, a Fannie Mae/Freddie Mac UNIFORM INSTRUMENT, and is not allowed under the laws of New York and other states, including New Jersey, Pennsylvania, Vermont, Massachusetts, and California.

97.     Nevertheless, SPS continued to assess Plaintiff Evans a monthly late fee.  On May 3, 2018, SPS mailed Plaintiff Evans a PAYOFF STATEMENT, which represented $835.89 in "Late Charges Outstanding."

98.     On May 15, 2018, SPS mailed a standard form mortgage statement to Plaintiff Evans, which stated that, "This account has been accelerated, which means that all outstanding amounts are due."   The SPS May 15, 2018 mortgage statement further stated, "If payment is received after June 16, 2018, $75.99 late fee will be charged."

99.     On June 14, 2018, SPS mailed a standard form mortgage statement to Plaintiff Evans, which stated that, "This account has been accelerated, which means that all outstanding amounts are due."   The SPS June 14, 2018 mortgage statement further stated, "If payment is received after July 16, 2018, $75.99 late fee will be charged."

100.    On July 5, 2018, Plaintiff Evans mailed SPS a second QWR, which placed SPS on notice that Plaintiff Evans believed the late fees which had been charged to his mortgage balance post-acceleration were improper.  Plaintiff Evans requested that the monthly late fees, including the most recent late fee of $75.99, which SPS represented in the June 14, 2018 mortgage statement would be charged if payment was not received by July 16, 2018, be removed and that SPS refrain from charging monthly late fees to Plaintiff Evans's mortgage account.

101.    On August 3, 2018, SPS wrote to Plaintiff Evans in response to his July 5, 2018 QWR.  SPS stated it "received your correspondence dated 07/05/2018.  We are in the process of completing our research of the issue(s) identified in your letter and expect to provide a response to you within the next thirty (30) days."

102.    On August 10, 2018, Plaintiff Evans wrote to SPS expressing his frustration with SPS's failure to timely reply and fully-respond to his July 5, 2018 QWR.  Plaintiff Evans

indicated that he would be taking legal action if SPS did not take corrective action concerning the improper late fees and other issues with his mortgage account.

103.    On September 13, 2018, forty-one days from August 3, 2018- and more than two months after receiving Plaintiff's July 5, 2018 QWR, SPS wrote to Plaintiff Evans.  SPS stated: "We have completed a full review of your inquiry and the account and our response is below. The issues presented in your letter are part of an ongoing litigation.  Due to the current litigation, SPS believes that it would be more appropriate to refrain from providing a detailed response to you at this time.  We encourage you to continue working with our legal counsel to determine4 the available resolution options."

104.    SPS failed to provide a timely, adequate response or take corrective action in response to Plaintiff's QWR to correct the improper late fees charged to Plaintiff Evans's account post-acceleration.  Moreover, the existence of ongoing litigation, which SPS failed to identify by caption or case number in its September 13, 2018 letter to Plaintiff Evans, is not an excuse for failure to take corrective action or to provide an adequate response to Plaintiff Evans's QWR concerning the improper late fees charged to his mortgage account post-acceleration.  The remedy proposed by SPS in the September 13, 2018 letter, *i.e.*, that Plaintiff Evans "continue" to work with SPS's lawyers, rings hollow:  Plaintiff Evans has not worked with any SPS lawyers and no name or contact information of said lawyers was provided by SPS in the September 13, 2018 letter.  SPS thus provided an untimely, inadequate, insufficient and misleading explanation of why the information and corrective action requested by Plaintiff Evans was unavailable or could not be obtained by the servicer in violation of 12 U.S.C. § 2605(2)(A)(c)(i).

105.   SPS violated RESPA 12 U.S.C § 2605(e)(2) by failing to provide a substantive response to Plaintiff Evans within 30 days, including failing to "(1) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction"; or (2) "after conducting an investigation, provide the borrower with a written explanation or clarification" that including (i) a statement of the reasons the servicer believes the account is correct and (ii) the contact information of a servicer employee or office that can provide assistance to the borrower."

106.   As a result of SPS's RESPA QWR violations, Plaintiff Evans has suffered damages, including postage and copying fees, uncorrected late fees which have been charged to his mortgage account, and additional out of pocket expenses incurred in meeting with legal counsel as a result of SPS's failure to timely and adequately respond to his QWRs and take the requested corrective action.

107.   Upon information and belief, SPS routinely fails to timely and adequately respond to QWRs from Class members and fails to take corrective action to remove the erroneous and unlawful charges to mortgage accounts. Indeed, other home mortgage borrowers have complained to the Consumer Financial Protection Bureau ("CFPB") and elsewhere that SPS fails to timely and adequately respond to QWRs. See https://getoutofdebt.org/104245/select-portfolio-servicing-inc-cfpb-complaint-4;

https://www.consumeraffairs.com/finance/select_portfolio.html?page=8;

https://www.consumeraffairs.com/finance/select_portfolio.html?page=11;

https://www.bankrank.org/complaint/2734366;

http://yourdailycomplaint.blogspot.com/2015/06/select-portfolio-servicing.html.

108.    Plaintiff Evans and the Class members for whom SPS violated 12 U.S.C § 2605 are entitled to damages, including actual damages and statutory damages, as a result of SPS's pattern and practice of violating RESPA QWR requirements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.  Certifying the Class and Subclasses pursuant to Federal Rule of Civil Procedure 23, certifying Plaintiff as the representative for of the Class and Subclasses, and designating his counsel as counsel for the Class and Subclasses;

B.  Actual and compensatory damages for injuries suffered by Plaintiff and the Class and Subclasses;

C.  Awarding Plaintiff and the Class and Subclasses statutory and exemplary damages where permitted;

D.  Injunctive relief, including, but not limited to, removal of charges for late fees and inspection fees imposed on the mortgage accounts of Plaintiff and the Class and Subclasses; and Reasonable attorney's fees and costs of this action and pre-judgment interest under the FDCPA, RESPA, GBL § 349, the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A; the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*; the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1, *et seq.*; and the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*; and

E.  Such other relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff, the Class, and Subclasses demand a trial by jury on all issues so triable

Dated:  October 25, 2018
New York, New York

**GISKAN SOLOTAROFF
& ANDERSON LLP**

Catherine E. Anderson, Esq.
Email: canderson@gslawny.com
Oren Giskan, Esq.
Email: ogiskan@gslawny.com
217 Centre Street, 6th Floor
New York, NY 10013
Tel: (212) 847-8315 x 12

**TUSA P.C**.
Joseph S. Tusa
Email:  joseph.tuspc@gmail.com
P.O. Box 566
Southold, NY 11971

-and-

150 Motor Parkway, Suite 401
Hauppauge, NY 11788
Tel: (631) 407-5100

***Counsel for Plaintiff
and Proposed Counsel for the Class
and Subclasses***

# EXHIBIT A

Suffolk
Dist: 0900
Sec: 210.00
Blk: 01.00
Lot: 054.000

After Recording Return To:
WMC MORTGAGE CORP. - POST
CLOSING

1 RAMLAND RD

ORANGEBURG, NY 10962

Attn:    (Equity Services)

Prepared By:
YVETTE BUXTON

WMC MORTGAGE CORP.

3100 THORNTON AVENUE

BURBANK, CA 91504

Meesha
$585.00

[Space Above This Line For Recording Data]

## MORTGAGE

Serv #: 11782774

EVANS
Loan #: 11782774
MIN:   100134300117037747
PIN:   SRHA 85380

## WORDS USED OFTEN IN THIS DOCUMENT

(A)   "Security Instrument." This document, which is dated September 28, 2006  , together with all
Riders to this document, will be called the "Security Instrument."

(B)   "Borrower." BRET EVANS

whose address is  26 CHEVIOT ROAD, SOUTHAMPTON, NY 11968
                                           sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)   "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing
under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026,
tel. (888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE
MORTGAGEE OF RECORD. ℅ 64318 Miller Road

(D)   "Lender." WMC MORTGAGE CORP.

will be called "Lender." Lender is Corporation                                    which exists under the laws of
CALIFORNIA                                    . Lender's address is   3100 THORNTON AVE., BURBANK,
CA 91504-3183

(E)   "Note." The note signed by Borrower and dated  September 28, 2006        , will be called the
"Note." The Note shows that I owe Lender

Five Hundred Sixty Thousand And 00/100
Dollars (U.S. $  560,000.00  ) plus interest and other amounts that may be payable. I have promised to
pay this debt in Periodic Payments and to pay the debt in full by October 1, 2036

(F)   "Property." The property that is described below in the section titled "Description of the Property,"
will be called the "Property."

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3833  1/01        (page 1 of 13 pages)
DOCUDNY1
DOCUDNY1.VTX  03/27/2003

11702774                                                    11702774

(G)    "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I)    "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider        ☐ Condominium Rider.              ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider   ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☒ Other(s) [specify] Balloon Rider

(J)    "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K)    "Community Association Dues, Fees, and Assessments." All dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L)    "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(N)    "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in, Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O)    "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q)    "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

NEW YORK--Single Family--Fannie Mae/Freddie Mae UNIFORM INSTRUMENT        Form 3033   1/01        (page 2 of 13 pages)
DOCUKNY2
DOCUKNY2.VTX   01/27/2003

11702774                                                              11702774

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

**DESCRIPTION OF THE PROPERTY**

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at     26 . CHEVIOT ROAD

                                                              [Street]

                                                              . New York  11968

SOUTHAMPTON                                                   [Zip Code]

[City, Town or Village]

This Property is in SUFFOLK                          County. It has the following legal description:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AND KNOWN AS EXHIBIT 'A' .

(B) All buildings and other improvements that . are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3033  1/01        (page 3 of 13 pages)

DOCUKNY1
DOCUKNY3.VTX  04/27/2001

*Atlantis Land Services Confidential*

Atlantis Land Services
Schedule A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Southampton, County of Suffolk and State of New York, known and designated as part of lot 5, block 100, amended Map A, westerly part of Shinnecock Hills, and filed in the Office of the County of Suffolk on October 22, 1925 as map no. 213, said lot being more particularly bounded and described as follows:

BEGINNING at a point on the southerly side of Depot Road, said point being situate the following two courses and distances easterly measured along the southerly line of Depot Road from a point formed by the intersection of the southerly line of Depot Road and the easterly side of lot no. 2, block 100;

1. South 62 degrees 32 minutes 16 seconds east 462.07 feet;

2. South 60 degrees 27 minutes 08 seconds east 35.45 feet;

RUNNING THENCE from the point of beginning south 60 degrees 27 minutes 08 seconds east, along the southerly line of Depot Road, 140.00 feet;

THENCE south 36 degrees 44 minutes 40 seconds west, 206.07 feet to the northerly line Cheviot Road a/k/a Cheviots Road;

THENCE along the northerly line of Cheviot Road a/k/a Cheviots Road the following two courses and distances;

1. On the arc of a regular curve to the left having a radius of 169.92 feet, a distance of 57.83 feet;

2. North 62 degrees 32 minutes 16 seconds west 49.96 feet;

THENCE north 27 degrees 27 minutes 44 seconds east, 198.72 feet to the point or place of BEGINNING.

Section: 310.01 Block: 01.00 Lot: 054.00  County: Suffolk

11702774                                                                11702774

**COVENANTS**

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:
First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3. **Monthly Payments For Taxes And Insurance.**
(a) **Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033  1/01          (page 4 of 13 pages)
DOCUKYY4
DOCUKYY4.VTU   01/27/2003

11702774                                                        11702774

(5)  The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6)  If required by Lender, the amount for any Community Association Dues, Fees, and Assessments. After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 to repay Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b)  Lender's Obligations. Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c)  Adjustments to the Escrow Funds. Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033  1/81          (page 5 of 15 pages)
DOCUKY!
DOCUMENTS.VFX  01/37/2002



11702774                                                                          11702774

4.   Borrower's Obligation to Pay Charges, Assessments And Claims.   I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the superior Lien. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Person. Borrower a notice identifying the superior Lien.   Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5.   Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.   I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless:

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033 1/01          (page 6 of 13 pages)
DOCUKBYB
DOCUKB7B.VTX   03/29/2002



11702774                                    11702774

(a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose.  During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction.  However, this inspection will be done promptly.  Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed.  Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds.  I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds.  If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument.  Such Insurance Proceeds will be applied in the order provided for in Section 2.  If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument.  I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property.  Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Borrower's Obligations to Occupy The Property.  I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument.  I will continue to occupy the Property and to use the Property as my principal residence for at least one year.  The one-year period will begin when I first occupy the Property.  However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so.  Lender may not refuse to agree unless the refusal is reasonable.  I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7.  Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.

(a)  Maintenance and Protection of the Property.  I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.  Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition.  Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes.  Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed.  If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b)  Lender's Inspection of Property.  Lender, and others authorized by Lender, may enter on and inspect the Property.  They will do so in a reasonable manner and at reasonable times.  If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property.  Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

8.  Borrower's Loan Application.  If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument.  False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence.  This is just one example of a false, misleading, or inaccurate statement of important information.

9.  Lender's Right to Protect Its Rights in The Property.  If:  (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033  1/01          (page 7 of 13 pages)

DOCUKY7
DOCUMENT_YER  02/77/2003



11703774                                11702774

proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I will not give up the rights that I have as a tenant on the Property. I will not cancel or terminate my lease and I will not change or alter that lease unless Lender agrees in writing to the change or amendment. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3833  1/01        (page 8 of 13 pages)
DOCUWITE
DOCUWITE  VER  04/27/2002



11762774                                                                    11762774

these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."

It also should be understood that: (a) any of these agreements will not increase the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has — if any — regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11. Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required immediate

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3033  1/01        (page 9 of 13 pages)
DOCUKIY9
DOCUSYS. VER  08/27/2003



11702774                                                                    11702774

Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

12. **Continuation of Borrower's Obligations And of Lender's Rights.**

(a) Borrower's Obligations.  Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so.  Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights.  Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future.  Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

13. **Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.**  If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together.  This means that any one of us may be required to pay all of the Sums Secured.  However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing.  Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

14. **Loan Charges.**  Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee.  Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits:  (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note).  If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

15. **Notices Required under this Security Instrument.**  All notices given by me or Lender in connection with this Security Instrument will be in writing.  Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means.  Notice to any one Borrower will be notice to all Borrowers unless Applicable

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3833  1/01        (page 10 of 15 pages)
DOCUKY10
DOCUKYA.VTX   06/27/2002



11702774                                          11702774

Law expressly requires otherwise.  The notice address is the address of the Property unless I give notice to Lender of a different address.  I will promptly notify Lender of my change of address.  If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision.  This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument:  (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18.  Agreements about Lender's Rights if the Property is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.  If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement.  The notice will give me at least 30 days to make the required payment.  The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument.  If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19.  Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped.  I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument.  In order to have this right, I will meet the following conditions:

    (a)  I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

    (b)  I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

    (c)  I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

    (d)  I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required.  However, I will not have the right to have Lender's

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033  1/01          *(page 11 of 13 pages)*
DOCUKYT11
DOCUKYTX.VTX  08/27/2008



11702774                                                                                    11702774

enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

20.  Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance. The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times.  I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer."  There may be a change of the Loan Servicer as a result of the sale of the Note.  There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note.  Applicable Law requires that I be given written notice of any change of the Loan Servicer.  The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments.  The notice also will contain any other information required by RESPA or Applicable Law.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action.  If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.  All rights under this paragraph are subject to Applicable Law.

21.  Continuation of Borrower's Obligations to Maintain and Protect the Property.  The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law."  Environmental Law classifies certain substances as toxic or hazardous.  There are other substances that are considered hazardous for purposes of this Section 21.  These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials.  The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law.  An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so.  I will not cause or permit Hazardous Substances to be present on the Property.  I will not use or store Hazardous Substances on the Property.  I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so.  I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products).  I may use or store these small quantities on the Property.  In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any  condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If I learn, or any governmental or regulatory authority, or any private party, notifies me

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3833  1/01          (page 12 of 13 pages)

DOCUKNY13
DOCUKNY3.VTX  02/21/2003



11702774                                                                                   11702774

that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

22. **Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full.".

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct the default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

11702774                                                    11702774

25.  Borrower's Statement Regarding the Property [check box as applicable].

☒  This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐  This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐  This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 19 of this Security Instrument and in any Rider signed by me and recorded with it.

_Bret Evans_  09-28-06.

- Borrower - BRET EVANS - Date -

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3033  1/01     (page 14 of 15 pages)

DOCUKNY34
DOCUKMTH.VER  04/27/2005

11702774                                                        11702774

|Space Below This Line For Acknowledgment]

STATE OF NEW YORK
COUNTY OF NASSAU

On this 28th day of September, in the year 2006, before me, the undersigned, a notary public in and for said state, personally appeared Bret Evans.

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s)               subscribed to the within instrument and acknowledged to me that               executed the same in capacity(ies), and that by               signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public          Margaret A. Jayne

My Commission Expires:

Margaret A. Jayne
Notary Public, State of New York
Registration No. 01JA6079823
Qualified in Suffolk County
Commission Expires September 3, 2010

NEW YORK—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033   1/01          (page 15 of 15 pages)
DOCUKNY15
DOCUKNY5.VTX   30/27/2005



## ADJUSTABLE RATE RIDER
(6-Month LIBOR Index – Rate Caps)
(First Business Day of Preceding Month Lookback)

Serv #: 11702774

EVANS
Loan #: 11702774
MIN: 100136300117027747

THIS ADJUSTABLE RATE RIDER is made this 28th        day of  September, 2006
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the
Borrower's Adjustable Rate Note (the "Note") to WMC MORTGAGE CORP.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
26 CHEVIOT ROAD, SOUTHAMPTON, NY 11968

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of    7.590      %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)    Change Dates
The interest rate I will pay may change on the first day of October, 2008
and may change on that day every  6th    month thereafter. Each date on which my interest rate
could change is called a "Change Date."

MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (First Business Day Lookback)—Single Family—
DOCUD1X1
DOCUD1X1.VTX  81/27/2004
Page 1 of 3

11702774                                                          11702774
    (B)    The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

    (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and One-Fourth                          percentage point(s) ( 6.250    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on a date that is 20    years after the Maturity Date (such date being referred to herein as the "Amortization Date") at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I understand that as a result of the Amortization Date being after the Maturity Date, I will have a balloon payment on the Maturity Date.

    (D)    Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.990 % or less than 7.990    %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One                      percentage point(s) ( 1.000    %) from the rate of interest I have been paying for the preceding 6    months. My interest rate will never be greater than 14.490  %, or less than 7.990    %.

    (E)    Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

    (F)    Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.**    **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

11702774                                                          11702774

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

~ Borrower ~ BRET EVANS ~ Date ~

MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (First Business Day Lookback)--Single Family--
Page 3 of 3
DOCU#310
DOCUFILE3.VTX  01/27/2006

[Space Above This Line For Recording Data]

## BALLOON RIDER

EVANS

Serv #: 11702774
Loan #: 11702774
MIN: 100136300117027747

THIS BALLOON RIDER is made this 28th day of September, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note (the "Note") to WMC MORTGAGE CORP.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at: 26 CHEVIOT ROAD SOUTHAMPTON, NY 11968

[Property Address]

The interest rate stated on the Note is called the "Note Rate". The date of the Note is called the "Note Date". I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder".

ADDITIONAL COVENANTS. In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

NOTWITHSTANDING THE 50 -YEAR AMORTIZATION PERIOD, THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN

BALLOON RIDER MULTISTATE (01/97)
DOCUHAI
DOCHA21.VTX 05/24/2006

Page 1 of 2



11702774
IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. ACCORDINGLY, IF THIS LOAN
HAS NOT BEEN SATISFIED, YOU WILL HAVE A BALLOON PAYMENT ON THE MATURITY
DATE.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____  09-28-06
- Borrower - BRET EVANS - Date -

BALLOON RIDER MULTISTATE (01/97)                    Page 2 of 2









**SUFFOLK COUNTY CLERK**
**RECORDS OFFICE**
**RECORDING PAGE**

Type of Instrument: ASSIGNMENT OF MORTGAGE     Recorded:     11/23/2009
Number of Pages: 2                             At:           03:25:00 PM
Receipt Number : 09-0135045

                                               LIBER:        M00021885
                                               PAGE:         275

District:          Section:           Block:              Lot:
0900               210.00             01.00               054.000

EXAMINED AND CHARGED AS FOLLOWS
Received the Following Fees For Above Instrument
                              Exempt                              Exempt
Page/Filing        $10.00     NO      Handling        $20.00     NO
COE                $5.00      NO      NYS SRCHG        $15.00     NO
Notation           $0.50      NO      Cert.Copies      $0.00     NO
RPT                $30.00     NO

                              Fees Paid              $80.50
THIS PAGE IS A PART OF THE INSTRUMENT
THIS IS NOT A BILL

JUDITH A. PASCALE
County Clerk, Suffolk County

**1** **2.**

Number of pages  2

This document will be public record. Please remove all Social Security Numbers prior to recording.

RECORDED
2009 Nov 23 03:25:00 PM
JUDITH A. PASCALE
CLERK OF
SUFFOLK COUNTY
L M00021885
P 275

| Deed / Mortgage Instrument | Deed / Mortgage Tax Stamp | Recording / Filing Stamps |
|---|---|---|

**3** FEES

| | | |
|---|---|---|
| Page / Filing Fee | | Mortgage Amt. |
| Handling | 5. 00 | 1. Basic Tax |
| TP-584 | | 2. Additional Tax |
| Notation | SO | Sub Total |
| EA-52 17 (County) | Sub Total | Spec./Assit. |
| EA-5217 (State) | | or |
| R.P.T.S.A. | 30 | Spec. /Add. |
| Comm. of Ed. | 5. 00 | TOT. MTG. TAX |
| Affidavit | | Dual Town  Dual County |
| Certified Copy | | Held for Appointment |
| NYS Surcharge | 15. 00 | Transfer Tax |
| Other | | Mansion Tax |
| | Sub Total | The property covered by this mortgage is or will be improved by a one or two family dwelling only. |
| | Grand Total 80.50 | YES_____ or NO _____ |

If NO, see appropriate tax clause on page # _____ of this instrument.

| **4** Dist. 0906 | Section 210.00 Block 01.00 Lot 054.000 | **5** Community Preservation Fund |
|---|---|---|
| Real Property Tax Service Agency Verification | 11-2309 | Consideration Amount $ |
| | | CPF Tax Due $ |

Improved _____
Vacant Land _____

| **6** | Satisfactions/Discharges/Releases List Property Owners Mailing Address |
|---|---|

RECORD & RETURN TO:

Steven J. Baum, PC
220 Northpointe Pkwy., Suite B
Amherst, NY 14228

TD _____
TD _____
TD _____

| Mail to: Judith A. Pascale, Suffolk County Clerk 310 Center Drive, Riverhead, NY 11901 www.suffolkcountyny.gov/clerk | **7** Title Company Information |
|---|---|
| | Co. Name  Prime Title |
| | Title #  PT # 73707 |

**8** # Suffolk County Recording & Endorsement Page

This page forms part of the attached  Assignment of Mortgage  made by:
(SPECIFY TYPE OF INSTRUMENT)

MERS

TO
USBaK

The premises herein is situated in
SUFFOLK COUNTY, NEW YORK.

In the TOWN of  Southampton

In the VILLAGE _____

or HAMLET of _____

BOXES 6 THRU 8 MUST BE TYPED OR PRINTED IN BLACK INK ONLY PRIOR TO RECORDING OR FILING.

(over)



Loan # 23943285D

## ASSIGNMENT OF MORTGAGE

County of SUFFOLK, State of New York

Assignor: Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corp., 3300 SW 34th Ave. Suite 101, Ocala, FL 34474

Assignee: U.S. Bank National Association, as Trustee for J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Asset Backed Pass-Through Certificates, Series 2006-WMC4, 180 East 5th St., St. Paul, MN 55101

Original Lender: Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corp.

Mortgage made by BRET EVANS, dated the 28th day of September, 2006 in the amount of Five hundred and sixty thousand dollars ($560,000.00) and interest, recorded on the 12th day of June, 2007 in the Office of the Clerk of the County of SUFFOLK at Liber 21550 of Mortgages at Page 644.

This said mortgage has not been otherwise assigned.

Property Address: 26 CHEVIOT ROAD, SOUTHAMPTON, NY 11968
SBL #210.00-01.00-054.000

Know that All Men By These Present in consideration of the sum of One and No/100th Dollars and other good valuable consideration, paid to the above Named assignor, the receipt and sufficiency of which is hereby acknowledged the Said Assignor hereby assigns unto the above named Assignee the said Mortgage, Together with all moneys now owing or that may hereafter become due or owing in Respect thereof, and the full benefit of all the powers and of all the covenants and Provisions therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

*TO HAVE AND TO HOLD* the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.
*THIS* Assignment is not subject to the requirement of Section 275 of the Real Property Law because it is within the secondary mortgage market.
*IN WITNESS WHEREOF*, the Assignor has caused these presents to be signed by its duly authorized officer this 9th day of ___October___, 2009.

*IN PRESENCE OF*

Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corp.

BY: _____
Name: Stacy E. Spohn
Title: Vice President

State of ............ Ohio
County of ............ Franklin ............ ss:

On the 9th day of October in the year 2009 before me, the undersigned, a notary public in and for said state, personally appeared Stacy E. Spohn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument and that such individual made such appearance before the undersigned in the ............ Columbus Ohio ............ (insert city or political subdivision and state or other place acknowledgement taken — if acknowledgement is taken outside of New York State)

_____
Notary Public

LORENE PETERS
Notary Public, State of Ohio
My Commission Expires
01/11/2014

Steven J. Baum, PC
220 Northpointe Pkwy., Suite B
Amherst, NY  14228

73707