UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
BRET A. EVANS and LISA DESIMONE,
*on behalf of themselves and all others
similarly situated*,

                    Plaintiffs,

        - against -

SELECT PORTFOLIO SERVICING, INC.,

                    Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-5985 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

Plaintiffs, like many Americans, pursued the dream of homeownership by taking out mortgages. At some point during the span of Plaintiffs' mortgages, Defendant Select Portfolio Servicing, Inc. ("SPS") took over as their mortgage servicer. In that role, SPS collected Plaintiffs' mortgage payments, communicated with them by phone and mail about their debt, ordered inspections of their properties, and charged them inspection fees. Plaintiffs claim that these inspection fees violated the Fair Debt Collection Practices Act ("FDCPA") and breached the terms of their standard mortgage agreements, which, Plaintiffs contend, only authorized SPS to charge them for inspections that are "reasonable or appropriate" to protect the lender's interest in the property. The central issue in this case is whether the inspections SPS ordered and charged Plaintiffs for were, in fact, reasonable or appropriate.

Pending before the Court are (1) Defendant SPS's motion for summary judgment, and (2) Plaintiffs' motion for class certification. For the reasons set forth below, the Court denies both motions, but grants Plaintiffs leave to amend and refile their class certification motion.

## BACKGROUND

Unless otherwise noted, the following facts are drawn from the parties' statements of undisputed material facts pursuant to Federal Rule of Civil Procedure ("Rule") 56 and Local Rule of Civil Procedure ("Local Rule") 56.1.[1]

### I.   General Background: Mortgages, Foreclosures, Delinquency, and Default

"The obligation colloquially referred to as a 'mortgage' is usually embodied in two separate instruments: a promissory note and a security instrument."  Adam J. Levitin, *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title*, 63 Duke L.J. 637, 652 (2013). The security instrument "creates a security interest in the real property, while the note or bond represents the debt that is secured by a mortgage."  *Provident Bank v. Cmty. Home Mortg. Corp.*,

---

[1] (Def.'s Statement Undisputed Material Facts ("Def.'s 56.1"), Dkt. 203; Pls.' Resps. & Objs. Def.'s 56.1 ("Pls.' Resp. 56.1"), Dkt. 186, at ECF 2–72; Pls.' Counter-Statement Undisputed Material Facts ("Pls.' 56.1"), Dkt. 186, at ECF 72–82; Def.'s Resps. & Objs. Pls.' 56.1 ("Def.'s Resp. 56.1"), Dkt. 206.)  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.  Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a Local Rule 56.1 statement incorporates by reference the document(s) cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court construes any disputed facts in the light most favorable to Plaintiffs, as the non-moving party, for purposes of SPS's summary judgment motion.  *See Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (citing *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  However, where Plaintiffs either (1) admit or (2) deny without citing to admissible evidence certain of the facts alleged in SPS's Local Rule 56.1 statement, the Court may deem such facts undisputed.  *See* Loc. R. 56.1(c)–(d).

This case contains many sealed filings.  There are also public, but redacted, versions of the sealed documents.  Unless otherwise noted, the Court's citations throughout this Memorandum & Order are to the public documents.  However, if the information the Court cites or quotes is redacted from the public document, the Court will cite the sealed document.  To the extent the Court cites or quotes a document that is sealed, the Court has reviewed the document and determined that the cited or quoted section does not merit sealing.  In an abundance of caution, however, this Memorandum & Order will be filed on a restricted basis to allow the parties fourteen (14) days to object to any portion of the Memorandum & Order that contains information that should remain restricted, i.e., redacted.  If no such objections are timely filed, the Memorandum & Order will be made public in its entirety.

498 F. Supp. 2d 558, 564 (E.D.N.Y. 2007).  Prospective homebuyers frequently take out so-called "conventional mortgages" from private lenders, such as banks, in order to purchase homes.  *See Mortgage*, Black's Law Dictionary (12th ed. 2024).[2]  The borrower agrees to make loan payments to the lender in exchange for upfront funding to purchase the property; the lender maintains an interest in the property until the debt is paid off.  *See Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 259 (2d Cir. 2014).  If the borrower fails to comply with the terms of their mortgage, the lender can initiate foreclosure proceedings—by taking title to the property or forcing a sale of the property—to satisfy the unpaid debt.  *See Foreclosure*, Black's Law Dictionary (12th ed. 2024).

Most mortgages, including both the note and security instrument, are standardized.  Julia Patterson Forrester, *Fannie Mae/Freddie Mac Uniform Mortgage Instruments: The Forgotten Benefit to Homeowners*, 72 Mo. L. Rev. 1077, 1077, 1087–88 (2007).  Fannie Mae and Freddie Mae are private, government-sponsored enterprises ("GSEs") that dominate the mortgage industry, and they provide uniform mortgage instruments that underlie "the great majority of home mortgage loans."  *Id.* at 1077.  Even private/conventional loans that are not owned or guaranteed by Fannie Mae or Freddie Mac frequently use the uniform mortgage instruments, in part because the loans cannot be purchased by Fannie Mae or Freddie Mac in the future unless they are documented on the Fannie Mae/Freddie Mac uniform instruments.  *Id.* at 1085–86.  The instruments contain both "uniform covenants," which are clauses applicable in every state, and "non-uniform covenants," that conform to the states' specific laws.  *See id.* at 1083–84.

If a borrower fails to make their payments on the note as promised, the debt first becomes "delinquent," and then, at some point, it becomes "in default."  *See Zirogiannis v. Seterus, Inc.*,

---

[2] A "conventional mortgage" is specifically one that is not insured by the government. *Mortgage*, Black's Law Dictionary (12th ed. 2024).

221 F. Supp. 3d 292, 302 (E.D.N.Y. 2016) ("[A] delinquent loan is not necessarily in default."), *aff'd,* 707 F. App'x 724 (2d Cir. 2017) (summary order).  In the context of the FDCPA, courts across the country "have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default." *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003) (footnote omitted) (collecting cases).  Because the FDCPA does not define "default," the Second Circuit affords "considerable leeway" to lenders and borrowers to "contractually . . . define their own periods of default, according to their respective circumstances and business interests." *Id.* at 87 n.5.  In other words, the parties "contractually set the period of delinquency preceding default." *Id.*  Similarly, the Fannie Mae Servicing Guide clearly distinguishes between mortgage loans that are merely delinquent and those that are in default.  *See, e.g.*, *Determining if the Borrower's Mortgage Payment is in Imminent Default*, Fannie Mae Servicing Guide § D2-1-01 (Dec. 12, 2018)[3] (explaining that a borrower in "imminent default" may be eligible for a conventional loan modification to avoid default if the loan is "current or less than 60 days delinquent").

## II.     Mortgage Servicers: SPS's Business Model and Property Inspection Fees

Mortgage lenders may opt to contract with companies known as "mortgage servicers," such as Defendant SPS.  (*See* Def.'s 56.1, Dkt. 203, ¶ 1.)  SPS services mortgages both by collecting payments from borrowers and by helping to ensure the properties are well-maintained by, for example, confirming that the properties are occupied.  (*See id.* ¶¶ 1–2, 14.)  To achieve the latter goal, SPS orders property inspections.  (*See id.* ¶¶ 2–3.)  SPS sometimes charges the cost of those inspections to the lender whose interest SPS is protecting by inspecting the property.  (Def.'s

---

[3] *Available at* https://servicing-guide.fanniemae.com/svc/d2-1-01/determining-if-borrowers-mortgage-payment-imminent-default [https://perma.cc/52T7-TJEP] (last visited March 31, 2026).

Sealed 56.1, Dkt. 194, ¶¶ 8–9, 12.)  At other times, it passes the cost along to the borrower in the form of a property inspection fee added to the borrower's mortgage statement.  (*Id.* ¶¶ 8, 12, 49, 59, 70, 82.)

> ### A.  SPS's Criteria and Formula for Ordering Property Inspections

SPS states that its policy on property inspections is to order them for loans that are delinquent, regardless of whether the property is occupied.  (*See* Def.'s 56.1, Dkt. 203, ¶ 13.)  Even when prior inspections have confirmed occupancy, SPS states that it continues to order inspections of the property to confirm that the property remains occupied and that "the condition of the property is not deteriorating."  (*Id.* ¶¶ 13–15.)

SPS uses an automated formula to generate a list of properties to be inspected.  (*See* Pls.' Joint Decl. Supp. Pls.' Opp'n Def.'s Mot. Summ. J. ("Pls.' MSJ Decl.") Ex. 1 ("Funk Dep. Excerpt"), Dkt. 185-2, at ECF 15–16 (explaining that SPS's system electronically generates a list of properties for inspections and that more than 95% of inspections ordered by SPS are ordered automatically).)  The code for that formula is referred to as the "Inspection SQL Code."  (*See* Pls.' Joint Decl. Supp. Pls.' Mot. Class Certification ("Pls.' Class Cert. Decl."), Dkt. 183-1, ¶ 50 (introducing a true and correct copy of a "native Excel spreadsheet produced by SPS in this action," which "contains the SQL formulaic code used by SPS to automatically search SPS's databases to identify and collect borrowers' loans for property inspections"); Pls.' Class Cert. Decl. Ex. 12 ("Inspection SQL Code"), Dkt. 191-6.)  SPS maintains data on the loans it services, (Def.'s 56.1, Dkt. 203, ¶ 1), and that data is fed into the Inspection SQL Code to determine whether to order an inspection.  (*See* Pls.' Class Cert. Decl., Dkt. 183-1, ¶ 50.)

For instance, SPS assigns each of the loans it services a "loan status code."  (Pls.' 56.1, Dkt. 186, ¶ 60.)  There are many different loan status codes, and each loan can only have a single loan status code at a time.  (*See id.* ¶ 61.)  As relevant here, there are loan status codes for loans

that are "current," "in default," in "foreclosure," and in "forbearance[4]."  (*Id.* ¶¶ 62–65; Pls.' MSJ Decl. Ex. 41 ("Loan Status Codes"), Dkt. 193-24, at ECF 2.)[5]  SPS only orders automatic property inspections for loans with certain loan status codes.  According to one of SPS's internal procedure guides for its "Real Estate Owned Department" ("REO"), the Inspection SQL Code will only order an automatic property inspection for loans that are, *inter alia*, current, in default, or in foreclosure (but not, for example, in forbearance).  (Pls.' MSJ Decl. Ex. 12 ("SPS REO Policy"), Dkt. 193-7, at ECF 4.)[6]  The loan also must be at least a certain number of days delinquent (i.e., past due) for an automatic inspection to be ordered.  (*Id.*)[7]

Even if a loan would otherwise be subject to an automatic inspection, there are certain exceptions to SPS's policy.  For example, SPS states that it does not order property inspections if it has established a "Quality Right Party Contact" ("QRPC") with the borrower within the preceding 30 days.  (Def.'s Sealed 56.1, Dkt. 194, ¶¶ 18–19.)  Not all contacts with a borrower

---

[4] A forbearance agreement is "a compromise and settlement in which a creditor . . . agrees not to enforce a right or invoke a remedy as long as the debtor takes some action, such as making periodic payments."  *Forbearance*, Black's Law Dictionary (12th ed. 2024).

[5] The parties dispute the significance of these various loan status codes.  Plaintiffs contend that a loan designated as current cannot, by definition, be delinquent or in default, because the loan status codes are mutually exclusive.  (*See, e.g.*, Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶ 56 (disputing that one of the named Plaintiffs could be considered delinquent when her loan status was designated "current").)  SPS argues that the definition of a loan designated "current" can still be delinquent; SPS claims that the "current" loan status code applies to both current loans and loans that are "less than 90 days delinquent" and "have not been demanded."  (Def.'s Sealed Resp. 56.1, Dkt. 198, ¶¶ 62–63.)  However, while it is disputed whether a loan with a "current" loan status can be considered "delinquent," it appears undisputed that such a loan *cannot* be considered "in default."

[6] The Inspection SQL Code appears to confirm this.  (*See* Inspection SQL Code, Dkt. 191-6, at ECF 6.)

[7] The Inspection SQL Code appears to confirm this.  (*See* Inspection SQL Code, Dkt. 191-6, at ECF 4.)

6

constitute a QRPC; according to SPS, a "QRPC occurs when SPS has contact with the borrower regarding the delinquency of their account and resolution of their delinquency." (*Id.* ¶¶ 19–20.) However, SPS's REO Policy only applies the QRPC exception to "GSE" loans, such as those owned by Fannie Mae or Freddie Mac, (*see* SPS REO Policy, Dkt. 193-7, at ECF 4–5),[8] and neither of the named Plaintiffs in this case have or had GSE loans, (*see* Pls.' Resp. 56.1, Dkt. 186, ¶ 19 (noting "neither [named Plaintiff's] mortgage was owned by a GSE when serviced by SPS")). For non-GSE loans, the REO Policy states that there is an exception if there was a "right party contact" ("RPC") within 30 days. (*See* SPS REO Policy, Dkt. 193-7, at ECF 4.) The definition of an RPC, and how it differs from a QRPC, is unclear.

Relatedly, SPS maintains data on its contacts with borrowers, and assigns "contact codes" to different types of contacts. (*See* Pls.' MSJ Decl. Ex. 38 ("Contact Codes"), Dkt. 193-23.) But SPS does not have a specific contact code for contacts that it considers RPCs or QRPCs. (Pls.' 56.1, Dkt. 186, ¶¶ 39–41; *see* Contact Codes, Dkt. 193-23, at ECF 2–4.) SPS states instead that it can subjectively determine whether a contact is an RPC or QRPC based on the qualitative description of the contact in SPS's internal notes. (*See* Def.'s Resp. 56.1, Dkt. 206, ¶¶ 40–41 (stating that SPS's recorded information "reflects [the] substance of contacts").) Indeed, it is unclear from the Inspection SQL Code whether the "contact codes" are considered at all when ordering inspections for non-GSE loans, or whether the formula considers only the date, but not the type, of the last contact. (*See* Inspection SQL Code, Dkt. 191-6, at ECF 3 (for "normal" loans, indicating that inspections will not be ordered if there was "contact with the [borrower] within the past thirty (30) days" without specifying that the contact must be an RPC or QRPC).)

---

[8] The Inspection SQL Code appears to confirm that the QRPC exception applies only to "GSE" loans. (*See* Inspection SQL Code, Dkt. 191-6, at ECF 5.)

7

There are other exceptions to SPS's automatic property inspections as well. According to the REO Policy, the exceptions include, but are not limited to, if the "[l]oan has an active payoff quote," and if the loan has "EZ-Pay arrangements set within the next 30 days." (SPS REO Policy, Dkt. 193-7, at ECF 4.)

Every day, the Inspection SQL Code generates a new Excel spreadsheet of properties to inspect. (*See* Funk Dep. Excerpt, Dkt. 185-2, at ECF 16.) The Inspection SQL Code flags, for human review, certain loans to which an exception to SPS's automated inspection policy might apply. (*See id.* at ECF 15.) SPS employee Rachel Funk reviews the flagged loans, determines if there is a "valid exception," and then finalizes the inspection list. (*See id.*)

### B.    SPS's Process for Conducting Property Inspections and Charging Fees

SPS does not conduct property inspections itself. (Def.'s 56.1, Dkt. 203, ¶ 3.) It contracts with a company called Residential Real Estate Review ("RRR") to conduct the inspections. (*Id.* ¶ 4.) SPS and RRR are subsidiaries of the same parent company, SP Holding Enterprises Corporation, which itself is a wholly-owned subsidiary of Credit Suisse (USA), Inc. (Pls.' 56.1, Dkt. 186, ¶¶ 47–49.) SPS and RRR's corporate offices are on the same floor of the same building in Salt Lake City, Utah. (*Id.* ¶¶ 51–52.) Plaintiffs contend that SPS and RRR are affiliates, (*see* Pls.' Resp. 56.1, Dkt. 186, ¶¶ 4–5), while SPS emphasizes that the two are "separate corporate entities," (Def.'s 56.1, Dkt. 203, ¶ 5).

RRR also does not conduct property inspections itself. (Pls.' Resp. 56.1, Dkt. 186, ¶¶ 4, 7; Def.'s Resp. 56.1, Dkt. 206, ¶ 5.) RRR hires other companies to complete the inspections. (Pls.' 56.1, Dkt. 186, ¶¶ 5–6.) Safeguard Properties Management, LLC ("Safeguard") and ServiceLink Field Services, LLC ("ServiceLink") are two of the companies that complete property inspections for SPS through RRR. (*Id.*) Safeguard and ServiceLink charge $12 for an exterior inspection of a property securing a conventional mortgage. (*Id.* ¶¶ 7, 9.) The parties dispute how much each

8

inspection ultimately ends up costing SPS.  Plaintiffs contend, and cite evidence showing, that $12 is the cost to SPS.  (*See* Pls.' Resp. 56.1, Dkt. 186, ¶¶ 45, 54, 67, 79, 91; *see also* Pls.' Sealed 56.1, Dkt. 193-1, ¶ 14 (excerpt from the SPS's "Inspection Knowledge Guide" showing that the "Max Vendor Amount" for an exterior conventional loan inspection is $12); Funk Dep. Excerpt, Dkt. 185-2, at ECF 46 (testifying that the deponent was "sure" that the "maximum vendor amount" in SPS's Inspection Knowledge Guide is the "amount that RRR is supposed to be billing SPS").) SPS contends, and cites evidence showing, that the cost to SPS is higher than $12, because RRR charges SPS more than Safeguard or ServiceLink charge RRR.  (*See* Def.'s Sealed 56.1, Dkt. 194, ¶¶ 8–9 (stating that SPS charges borrowers the amount RRR charges SPS); *id.* ¶¶ 36, 45, 54, 67, 79, 91, 131, 133–39 (detailing alleged RRR charges to SPS, and SPS charges to borrower); *see also* Weinberger Decl. Supp. Def.'s Mot. Summ. J. ("Weinberger Decl.") Exs. 4–9, 36–43 ("RRR Invoices"), Dkt. 212, at ECF 54–67, 646–61.)

After the property inspection has been conducted and charged to SPS, SPS then needs to decide whether to pass the cost on to the borrower or the lender.  (Def.'s Sealed 56.1, Dkt. 194, ¶¶ 8–9.)  SPS does not state how it makes that decision; it states only that it "follows its policies and procedures with respect to . . . assessing inspection fees."  (Def.'s 56.1, Dkt. 203, ¶ 10.)  The parties dispute what these policies and procedures precisely are.  According to SPS's internal "Online Policy and Procedure Resource" for its Corporate Advance Control ("CAC") division, inspection fees should *not* be charged to the borrower when the inspection fee is "within thirty (30) days of the most recent transaction," when there has been "contact in the last thirty (30) days," or when the inspection fee is "before the loan reached the forty five (45) day delinquency mark." (*See* Pls.' MSJ Decl. Ex. 15 ("SPS CAC Policy"), Dkt. 193-8, at ECF 3–4; *see also* Pls.' Sealed 56.1, Dkt. 193-1, ¶¶ 36, 42.)  SPS states that Plaintiffs' excerpt of the CAC Policy

9

"[m]ischaracterizes the policy and only includes portions of policies and procedures," without citing contrary evidence or specifying what its policy *actually* is.  (Defs.' Resp. 56.1, Dkt. 206, ¶¶ 36, 42.)  As additional evidence of SPS's policy, Plaintiffs produced a "fee schedule" that SPS sent to one of the named Plaintiffs in this case, in which SPS represented that it would charge them property inspection fees "if you [the borrower] are in default and we [SPS] cannot make contact with you to determine the condition of the property."  (Pls.' MSJ Decl. Ex. 40 ("SPS Fee Schedule"), Dkt. 185-41, at ECF 2; *see also* Def.'s Resp. 56.1, Dkt. 206, ¶ 59 (confirming that SPS provided this fee schedule).)

### III.    Plaintiff DeSimone

Plaintiff Lisa DeSimone is the owner of a residential property located at 1053 91st Street, Niagara Falls, New York, 14304 (the "DeSimone Property").  (Def.'s 56.1, Dkt. 203, ¶ 22.)  On April 17, 2005, DeSimone took out a $74,700 note and mortgage on the DeSimone Property from Wilmington Finance, a division of AIG Federal Savings Bank.  (Pls.' Resp. 56.1, Dkt. 186, ¶ 23; Second Am. Class Action Compl. ("SAC") Ex. B ("DeSimone Mortg."), Dkt. 160-2, at ECF 2.)

DeSimone's mortgage agreement is a Fannie Mae/Freddie Mac Uniform Instrument. (DeSimone Mortg., Dkt. 160-2, at ECF 3.)  As relevant here, DeSimone's mortgage agreement includes the following uniform covenants:

- "Borrower's Promise to Pay" ("Section 1"), which states that she "will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note."  (*Id.* at ECF 6 § 1.)

- An obligation for the borrower "to Maintain and Protect the Property" ("Section 7"), which authorizes the lender and others authorized by the lender to "enter on and inspect the Property" and states that "[t]hey will do so in a reasonable manner and at reasonable times."  (*Id.* at ECF 10 § 7(b).)

- "Lender's Right to Protect its Rights in The Property" ("Section 9"), which states that if DeSimone "do[es] not keep [her] promises and agreements made in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under

10

this Security Instrument." (*Id.* at ECF 11 § 9.)  It provides the following examples of actions the lender might take: "protecting and/or assessing the value of the Property," "securing and/or repairing the Property," "paying sums to eliminate any Lien against the Property," "appearing in court," and "paying reasonable attorneys' fees to protect its interest in the property." (*Id.*)  It further provides that DeSimone "will pay to Lender any amounts, with interest, which Lender spends under this Section." (*Id.*)

- "Loan Charges" ("Section 14"), which provides that "Lender may charge [DeSimone] fees for services performed in connection with [DeSimone's] default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection [fees,] and valuation fees," and states that "the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee." (*Id.* at ECF 14 § 14.)  Section 14 also provides, however, that "Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law." (*Id.*)[9]

SPS took over as the servicer of DeSimone's mortgage on September 1, 2014.  (Def.'s 56.1, Dkt. 203, ¶ 32.)  Both parties agree that DeSimone's mortgage "was in default when SPS became the servicing agent." (Def.'s SAC Answer, Dkt. 168, ¶ 5; *accord* SAC, Dkt. 160, ¶ 5.)[10]  However, once SPS began servicing the mortgage, DeSimone's loan was classified as having a loan status of "current" rather than "in default." (*See* Pls.' Sealed 56.1, Dkt. 193-1, ¶ 66 (SPS designated DeSimone's loan status as "curr[ent]" as early as September 11, 2014).)  DeSimone's mortgage was never assigned a loan status of "in default" within SPS's system. (*See id.* ¶ 78.)  However,

---

[9] The applicable law includes "[a]ll controlling applicable federal, state and local statutes, regulations, ordinances[,] and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions." (*Id.* at ECF 4.)  DeSimone's mortgage agreement specifically provides that the law that governs her mortgage is "federal law and the law of New York State." (*Id.* at ECF 14 § 16.)

[10] The Court can properly consider this factual admission from Defendant's answer at the summary judgment stage.  *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (explaining that on a motion for summary judgment, the court considers "all relevant, admissible evidence submitted the parties," including that which is "contained in [the] pleadings"); *Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation." (collecting cases)).

11

despite the mortgage's "current" status, SPS contends that DeSimone's loan was at times delinquent, that is, past due. (*See* Def.'s Sealed 56.1, Dkt. 194, ¶ 40.)

DeSimone's claims arise from two inspection fees that SPS charged her.[11] DeSimone paid $18 for each inspection fee. (Def.'s 56.1, Dkt. 203, ¶¶ 49, 59.) As previously discussed, the parties dispute how much the inspections cost SPS. (*See* Def.'s Sealed 56.1, Dkt. 194, ¶¶ 49, 59; Pls.' Resp. 56.1, Dkt. 186, ¶¶ 36, 45; Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶¶ 49, 59.) Plaintiffs argue that the cost for each was $12, which is the amount charged by Safeguard or ServiceLink; SPS claims that the cost for each was $18, the same amount it charged DeSimone, which it argues was the amount charged by RRR. (*See* Def.'s 56.1, Dkt. 203, ¶¶ 45, 54; Pls.' Resp. 56.1, Dkt. 186, ¶¶ 36, 45, 54.)

SPS states that it ordered the first inspection of the DeSimone Property on November 27, 2020. (*See* Def.'s 56.1, Dkt. 203, ¶ 42.) Three days later, on November 30, 2020, before the inspection took place, SPS's records show that DeSimone had "contact" with SPS wherein she promised to pay $2,200 by December 1, 2020. (*See* Def.'s Sealed Resp. 56.1, Dkt. 198, ¶ 37; Pls.' MSJ Decl. Ex. 20 ("DeSimone Account History Excerpt"), Dkt. 193-13, at ECF 5.) That same day, she also scheduled an EZ Pay payment. (Pls.' Sealed 56.1, Dkt. 193-1, ¶ 45.) The inspection took place on December 1, 2020. (Def.'s 56.1, Dkt. 203, ¶ 42.) The property inspection report confirmed that the DeSimone Property was occupied. (Pls.' Sealed 56.1, Dkt. 193-1, ¶ 32.) SPS charged DeSimone $18 for this inspection on December 3, 2020. (*Id.* ¶ 23.) The next day, SPS

---

[11] SPS ordered a total of five exterior inspections of the DeSimone Property, which were conducted on the following dates: (1) December 28, 2018; (2) June 21, 2019; (3) December 1, 2020; (4) October 6, 2021; and (5) December 15, 2022. (Def.'s Sealed 56.1, Dkt. 194, ¶ 34.) Of the five inspections, SPS invoiced DeSimone for four; SPS later removed two of the charges. (*Id.* ¶¶ 37–38; Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶¶ 37–38, 60.) DeSimone paid the remaining two charges, which were for the inspections on December 1, 2020, and October 6, 2021. (Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶ 37.)

sent DeSimone a mortgage statement stating that she had not made a payment on her mortgage loan in 168 days. (Def.'s Sealed 56.1, Dkt. 194, ¶ 47.)

SPS states that it ordered the second inspection of the DeSimone Property on October 1, 2021. (*See* Def.'s 56.1, Dkt. 203, ¶ 51.) The day before, on September 30, 2021, DeSimone had made a payment of approximately $600. (*See* Pls.' Sealed 56.1, Dkt. 193-1, ¶ 43; Pls.' MSJ Decl. Ex. 23 ("DeSimone Transaction History"), Dkt. 193-15, at ECF 3 (reflecting $594.67 payment on 9/30/2021).) Then, on October 4, 2021, before the inspection took place, DeSimone called SPS, scheduled a $700 EZ Pay payment for October 29, 2021, and promised that she would pay $700 again on November 26 and December 23, 2021. (*See* Pls.' Sealed 56.1, Dkt. 193-1, ¶¶ 38, 46; DeSimone Account History Excerpt, Dkt. 193-13, at ECF 3–4; DeSimone Transaction History, Dkt. 193-15, at ECF 3.) The inspection took place on October 6, 2021. (Def.'s 56.1, Dkt. 203, ¶ 51.) The property inspection report again confirmed that the DeSimone Property was occupied. (Pls.' Sealed 56.1, Dkt. 193-1, ¶ 33.) SPS charged DeSimone $18 for this inspection on October 28, 2021. (Pls.' 56.1, Dkt. 186, ¶ 25.) On November 3, 2021, SPS sent DeSimone a mortgage statement stating that she had not made a payment on her mortgage loan in 319 days. (Def.'s Sealed 56.1, Dkt. 194, ¶ 56.)

At some point in or around early 2022, DeSimone's mortgage loan entered into a loan status of "forbearance." (*See* Pls.' Sealed 56.1, Dkt. 193-1, ¶¶ 73–76 (noting December 2021 status as "curr[ent]," and April–December 2022 status as "[forbearance]").) In April 2023, SPS stopped servicing DeSimone's mortgage. (*See* Def.'s 56.1, Dkt. 203, ¶ 95.) At that time, the mortgage was in forbearance and was not in default. (Pls.' 56.1, Dkt. 186, ¶ 79 (noting loan "was not in default"); Def.'s Resp. 56.1, Dkt. 206, ¶ 79 (noting loan was "subject to COVID-19 relief

forbearance plan").).)  Since then, another company, Shellpoint Mortgage Servicing ("Shellpoint"), has serviced DeSimone's mortgage.  (Def.'s 56.1, Dkt. 203, ¶ 95.)

## IV.    Plaintiff Evans

Plaintiff Bret A. Evans is the owner of a residential property located at 26 Cheviot Road, Southampton, New York, 11968 (the "Evans Property").  (Def.'s 56.1, Dkt. 203, ¶ 101.)  On September 28, 2006, Evans took out a $560,000 note and mortgage on the Evans Property from WMC Mortgage Corporation.  (SAC Ex. A ("Evans Mortg."), Dkt. 160-1, at ECF 2–4.)

Evans's mortgage agreement is a Fannie Mae/Freddie Mac Uniform Instrument.  (*Id.* at ECF 5.)  Evans's mortgage agreement contains identical provisions to those from DeSimone's quoted above.  (*See id.* at ECF 8 (Section 1), 11 (Section 7), 11–12 (Section 9), 14 (Section 14).)

At some point in 2009, Evans stopped making payments on his note.  (Def.'s 56.1, Dkt. 203, ¶ 111.)  On October 9, 2009, Evans's mortgage and note were assigned from WMC Mortgage Corporation to U.S. National Bank Association, as Trustee for J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 ("U.S. Bank").  (*See* Evans Mortg., Dkt. 160-1 at ECF 28.)  Later that month, U.S. Bank filed a complaint in the Supreme Court of the State of New York in Suffolk County seeking to foreclose on Evans's mortgage.  (Def.'s 56.1, Dkt. 203, ¶ 113; Thompson Decl. Supp. Def.'s Mot. Summ. J. ("Thompson Decl.") Ex. L ("U.S. Bank Foreclosure Compl."), Dkt. 204, at ECF 227–37.)  The Suffolk County Supreme Court entered a foreclosure judgment against Evans in November 2018, nine years later and about a month after this lawsuit commenced. (*See* Def.'s 56.1, Dkt. 203, ¶ 114; Thompson Decl. Ex. M ("Suffolk Cnty. Foreclosure J."), Dkt. 204, at ECF 238–49.)  In August 2022, the Appellate Division of the New York Supreme Court for the Second Judicial Department upheld the foreclosure judgment.  (Def.'s 56.1, Dkt. 203, ¶ 116.)  On September 27, 2022, Evans filed a motion for re-argument or for leave to appeal the decision to the New York Court of Appeals.  (*See* Pls.' MSJ Decl. Ex. 52 ("Second Dep't Dkt.

14

Rep. Request"), Dkt. 185-53, at ECF 2.)  As of the time the parties briefed their summary judgment and class certification motions, Evans's motion for re-argument or for leave to appeal was still pending before the Second Judicial Department.  (*Id.*; Pls.' Resp. 56.1, Dkt. 186, ¶ 116.)

SPS began servicing Evans's mortgage on June 1, 2013, (*see* Def.'s 56.1, Dkt. 203, ¶ 118), while the above-mentioned foreclosure action was pending in the Suffolk County Supreme Court. On June 7, 2013, SPS classified Evans's loan status code as "foreclosure."  (Pls.' Sealed 56.1, Dkt. 193-1, ¶ 80.)

Evans's claims arise from two inspection fees that SPS charged him.[12]  Evans was charged $15 for each inspection.  (Def.'s 56.1, Dkt. 203, ¶ 15; Pls.' 56.1, Dkt. 186, ¶¶ 19–22.)  The parties again dispute how much the inspections cost SPS.  (*See* Pls.' Resp. 56.1, Dkt. 186, ¶¶ 139 (disputing that SPS was charged or paid more than $12 per inspection); Def.'s Sealed Resp. 56.1, Dkt. 198, ¶¶ 8–10, 15–18 (responding that SPS charges borrower "in the same amount" that it is charged for an inspection).)

SPS ordered the first inspection of the Evans Property on December 14, 2017.  (Pls.' MSJ Decl. Ex. 34 ("Dec. 2017 Evans Insp. Report"), Dkt. 185-35, at ECF 2.)  The inspection took place on December 17, 2017.  (*Id.*)  The property inspection report confirmed that the Evans Property was occupied.  (*Id.*)  SPS charged Evans for this inspection on December 19, 2017, and the $15 fee was added to his loan balance.  (*See* Pls.' MSJ Decl. Ex. 32 ("Jan. 2018 Evans Mortg. Statement"), Dkt. 185-33, at ECF 2.)

---

[12] The Second Amended Class Action Complaint lists many other inspection fees that Evans was allegedly charged, (*see* SAC, Dkt. 160, ¶¶ 55–57), but he is only seeking relief for those that fall within the FDCPA's one-year statute of limitations, (*see* Pls.' Opp'n Def.'s Mot. Summ. J., Dkt. 185, at 11).  The Court describes here only the inspection fees for which Evans is seeking relief.

SPS charged Evans for the second inspection on January 22, 2019, and the $15 fee was added to his loan balance. (Pls.' MSJ Decl. Ex. 33 ("June 2020 Evans Corp. Advance History"), Dkt. 185-34, at ECF 17.) It is unclear when SPS ordered this inspection, when it actually took place, and what it concluded about the Evans Property's occupancy status.

## PROCEDURAL HISTORY

Evans initiated this case as a putative class action on October 25, 2018. (*See* Class Action Compl., Dkt. 1.)[13] He sued SPS and U.S. Bank, N.A., alleging breach of contract, violation of the covenant of good faith and fair dealing, violation of the FDCPA, violation of New York General Business Law ("GBL") § 349, violations of other state consumer protection laws, and violation of the Real Estate Settlement Procedures Act. (*Id.* ¶¶ 58–108.) On June 27, 2019, Evans filed an amended class action complaint along with two other individuals named as plaintiffs, Juan A. Beher and Jessica Perez. (First Am. Class Action Compl., Dkt. 24.) The amended complaint also added Bank of America, N.A. and 25 unidentified lenders as additional defendants ("Doe Defendants 1–25"), (*id.* ¶¶ 9–10), and stated additional causes of action for violations of the California Unfair Competition Law ("UCL"), (*id.* ¶¶ 105–14), and the Truth in Lending Act, (*id.* ¶¶ 131–140).

On September 30, 2020, the Court dismissed the amended complaint in part. (*See* Mem. & Order, Dkt. 51.)[14] The claims that remained were: (1) Evans's FDCPA claim against SPS based on late fees and inspection fees; (2) Evans's GBL § 349 claim against SPS based on late fees; (3)

---

[13] The case was initially assigned to Judge Joan M. Azrack. (10/26/2018 Notice of Case Assignment.) On April 29, 2019, the case was reassigned to Judge William F. Kuntz, II. (4/29/2019 Notice of Case Reassignment.) Finally, on August 7, 2019, the case was reassigned to the undersigned. (8/07/2019 Order Reassigning Case.)

[14] The Memorandum & Order is reported at *Evans v. Select Portfolio Servicing, Inc.*, No. 18-CV-5985 (PKC) (SMG), 2020 WL 5848619 (E.D.N.Y. Sep. 30, 2020).

16

Beher's breach of contract claim against SPS for the miscalculation of interest rates; and (4) Beher's UCL claim against SPS for the miscalculation of interest rates. (*See id.* at 44.) Plaintiff Perez, Defendants Bank of America, N.A., and Doe Defendants 1–25 were terminated from the action. (*Id.*) The remaining claims proceeded to discovery, which continued from late 2020 through 2025. (*See* 10/03/2023 Dkt. Order (noting that "discovery has continually been extended in this case due to Defendant's refusal to comply with the Court's discovery orders"); Pls.' Letter, Dkt. 165 (reporting that "discovery [was] nearly completed" on March 14, 2025).) On April 26, 2023, Beher stipulated to dismiss his claims against SPS with prejudice. (Stipulation of Voluntary Dismissal, Dkt. 105.)

On October 22, 2024, DeSimone filed a separate class action complaint against SPS based on the same inspection fees described in Evans's complaint. *See* Compl., *DeSimone v. Select Portfolio Servs., Inc.*, No. 24-CV-7379 (PKC) (RML), Dkt. 1 (E.D.N.Y. filed Oct. 22, 2024). She sought relief on behalf of herself and a class of similarly situated individuals for breach of contract, violation of the covenant of good faith and fair dealing, and violation of the FDCPA. *Id.* ¶¶ 47–69. Shortly after, the Court consolidated DeSimone's and Evans's cases pursuant to Rule 42(a). (10/31/2024 Dkt. Order.)

On January 24, 2025, Plaintiffs, with leave of the Court, filed the Second Amended Class Action Complaint, which incorporated both Evans's and DeSimone's claims. (SAC, Dkt. 160.) On February 6, 2025, SPS filed a request for a pre-motion conference ("PMC") regarding its anticipated motion to dismiss the Second Amended Class Action Complaint in part. (Def.'s PMC Request, Dkt. 163.) The Court held a PMC on March 13, 2025, construed SPS's PMC request as a motion to dismiss, and denied that motion at the hearing. (3/13/2025 Min. Entry.) The Court also ordered the parties to file letters "explaining each party's respective positions on the timing

for briefing class certification and summary judgment." (*Id.*) The parties filed a joint letter on March 31, 2025, proposing that class certification and summary judgment be briefed simultaneously. (Joint Letter, Dkt. 171.)[15] The Court adopted the proposed briefing schedule and stated that "*this will be Defendant's only opportunity to file a Rule 56 motion; there will not be successive [or serial] summary judgment motion practice*." (4/03/2025 Dkt. Order (emphasis added).) Per the parties' briefing schedule, the class certification and summary judgment motions were both fully briefed on June 13, 2025. (*See* Dkts. 182–201.)[16]

SPS's motion for summary judgment is now before the Court.[17] SPS seeks summary judgment on the following claims, all relating to the assessment of property inspection fees:

1.      Breach of Contract, on behalf of DeSimone, (SAC, Dkt. 160, ¶¶ 85–92);

2.      Violation of the Covenants of Good Faith and Fair Dealing, on behalf of DeSimone, (*id.* ¶¶ 93–101); and

---

[15] The Court can properly rule on Defendant's motion for summary judgment before making a decision on Plaintiffs' motion for class certification. *See* Fed. R. Civ. P. 23(c) advisory committee's note to 2003 amendment (recognizing that "many valid reasons . . . may justify deferring the initial certification decision," including that "[t]he party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified"); Manual for Complex Litigation (Fourth) § 21.133 (2004) ("The court may rule on motions pursuant to Rule 12, Rule 56, or other threshold issues before deciding on certification; however, such rulings bind only the named parties." (footnote omitted)). In light of Defendant's unambiguous decision to propose a simultaneous briefing schedule for summary judgment and class certification, (*see* Joint Letter, Dkt. 171), the Court holds that Defendant has waived any objection to the Court's disposition of its motion for summary judgment prior to or simultaneously with Plaintiffs' motion for class certification.

[16] Thereafter, the Court instructed Defendant to file public and redacted versions of certain documents it had filed under seal. (6/16/2025 Dkt. Order.) Defendant filed those redacted documents between June 18 and 23, 2025. (*See* Dkts. 202–212.)

[17] (*See* Def.'s Mot. Summ. J. ("Def.'s MSJ"), Dkt. 187; Def.'s Mem. Supp. Def.'s MSJ ("Def.'s MSJ Mem."), Dkt. 202; Pls.' Mem. Opp'n Def.'s MSJ ("Pls.' MSJ Opp'n"), Dkt. 185; Def.'s Mem. Reply Supp. Def.'s MSJ ("Def.'s MSJ Reply"), Dkt. 205.)

18

3. <u>Violation of the FDCPA</u>, on behalf of DeSimone and Evans, (*id.* ¶¶ 102–109).[18]

Plaintiffs' motion for class certification is also now fully briefed before the Court.[19]

Plaintiffs seek to certify the following classes with DeSimone as the class representative for each:

1. <u>Upcharge Class</u>: "All borrowers nationwide whom SPS charged [property] inspection fees in an amount greater than the cost of the inspections charged by inspection vendors Safeguard and ServiceLink";

2. <u>FDCPA Class</u>: "All borrowers nationwide to whom SPS stated in letters when SPS began servicing the loan that the loans were in default or past due AND: (1) had an inspection fee added to the loan when the inspection of the property did not conclude the home was Vacant or Abandoned; or (2) had an inspection fee added to the loan that was charged within 30 days of SPS's Account Notes reflecting contact with or from the borrower (including a promise to pay)"; and

3. <u>Breach of Contract Class</u>: "All borrowers nationwide whose loans are not currently in a Loan Status of Default or Foreclosure or did not have a Loan Status of Default or Foreclosure when SPS ceased servicing their loans AND: (1) had an inspection fee added to the loan when the inspection of the property did not conclude the home was Vacant or Abandoned; or (2) had an inspection fee added to the loan that was charged within 30 days of SPS's Account Notes reflecting contact with or from the borrower (including a promise to pay)."

---

[18] Plaintiffs' fourth cause of action in the Second Amended Class Action Complaint is for violations of various state consumer protection statutes, on behalf of Plaintiff Evans and a proposed class, based on SPS's assessment of late fees. (*See* SAC, Dkt. 160, ¶¶ 110–22.) The parties report that they have reached a proposed classwide settlement regarding that cause of action. (*See* Def.'s MSJ Mem., Dkt. 202, at 1 n.1; Letter, Dkt. 165 ("[T]he parties . . . have reached an agreement on the late-fee class claim and are finalizing the papering of that part of the case and confirmatory discovery.").) Plaintiffs state that the parties will "present that settlement to the Court for approval pursuant to Fed. R. Civ. P. 23(e)." (*See* Pls.' Mem. Supp. Pls.' Class Cert. Mot., Dkt. 183, at 2 n.1; *see also infra* n.20.)

[19] (*See* Pls.' Mot. Class Certification ("Pls.' Class Cert. Mot."), Dkt. 183, at ECF 1–3; Pls.' Mem. Supp. Pls.' Class Cert. Mot. ("Pls.' Class Cert. Mem."), Dkt. 183, at ECF 4–35; Def.'s Mem. Opp'n Pls.' Class Cert. Mot. ("Def.'s Class Cert. Opp'n"), Dkt. 207; Pls.' Mem. Reply Supp. Pls.' Class Cert. Mot. ("Pls.' Class Cert. Reply"), Dkt. 190.)

(Pls.' Class Cert. Mot., Dkt. 183, at ECF 1–2.)[20]  The proposed classes exclude "SPS's officers, directors, employees, and agents as well as any outside counsel in this litigation"; "any judge to whom this case is assigned, along with his or her staff"; and "immediate family of any individual excluded" by the prior two exclusions. (*Id.* at ECF 2.)  Regarding the class periods, Plaintiffs state that "for the FDCPA claim, the class period begins on October 25, 2017," and "[f]or the breach of contract claim, the class period corresponds to the state where the property is located." (Pls.' Class Cert. Mem., Dkt. 183, at 2.)  As discussed *infra*, it is unclear what claims the Upcharge Class is asserting or its proposed class period.  Similarly, it is unclear whether the Breach of Contract Class is asserting both breach of contract *and* implied covenant claims.

## DISCUSSION

### I.   Defendant's Summary Judgment Motion

#### A.   Legal Standard

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute between the parties will not defeat a motion for summary judgment. *See Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Rather, a genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the nonmovant's favor." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016).  The Court resolves all factual ambiguities and draws

---

[20] The parties have also reached a settlement for a putative "Multistate Late Fees Class," with Plaintiff Evans as the class representative. *See supra* n.18.  Plaintiffs state that they "intend to present that settlement to the Court for approval pursuant to Fed. R. Civ. P. 23(e) upon final resolution of the classwide inspection fee claims." (Pls.' Class Cert. Mem., Dkt. 183, at 2 n.1.)

all permissible inferences in favor of the nonmoving party—here, Plaintiffs. *See Gustafson*, 819 F.3d at 675; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

"The party moving for summary judgment is initially responsible for demonstrating the absence of a genuine issue of material fact." *Holcomb*, 521 F.3d at 137 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] [the plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case." *Celotex*, 477 U.S. at 323, 325 (1986) (emphasis omitted). Once a defendant has met this burden, the plaintiff must "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a "non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment (collecting cases)).

"Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (citing *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 322–23).

## B.    DeSimone's Breach of Contract Claim Survives Summary Judgment

"To prevail on a claim for breach of contract under New York law, a plaintiff must show '(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and

21

(4) damages.'" *Wiener v. AXA Eq. Life Ins. Co.*, 113 F.4th 201, 214 (2d Cir. 2024) (quoting

*Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).  SPS argues, under

the second and third prongs, that DeSimone did not adequately perform under the contract because

she failed to timely make all of her mortgage payments, and that SPS did not breach the contract

because the mortgage agreement expressly authorized it to charge her property inspection fees.

(Def.'s MSJ Mem., Dkt. 202, at 10–15.)  As discussed below, the Court disagrees on both points.

### 1.  Whether DeSimone Adequately Performed Under the Contract

SPS first argues that it is entitled to summary judgment on DeSimone's breach of contract

claim because DeSimone failed to perform her obligations under the mortgage agreement.  (Def.'s

MSJ Mem., Dkt. 202, at 10–13.)  Specifically, SPS alleges that "when SPS ordered the

inspections . . . , DeSimone had failed to meet her payment obligations under [her] Mortgage

Agreement and had past due payments on her mortgage loan." (Def.'s MSJ Mem., Dkt. 202, at 7–8

(citing Def.'s 56.1, Dkt. 203, ¶¶ 40, 94).)

However, to recover for breach of contract, DeSimone need not have *completely* performed

under the agreement; she need only have *substantially* performed.  *See Optima Media Grp. Ltd. v.*

*Bloomberg L.P.*, No. 17-CV-01898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021)

("In order to recover for breach of contract [under New York law], a party must first show it

substantially performed under that contract." (citing *Diesel Props S.r.l. v. Greystone Bus. Credit*

*II LLC*, 631 F.3d 42, 52 (2d Cir. 2011))); *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500

F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is

excused where the other party has substantially failed to perform its side of the bargain or,

synonymously, where that party has committed a material breach.").  Substantial performance is

assessed "on the basis of several factors, such as the absolute and relative magnitude of default, its

effect on the contract's purpose, willfulness, and degree to which [the] injured party has benefitted

22

under the contract." *Merrill Lynch & Co.*, 500 F.3d at 186 (citing *Hadden v. Consol. Edison Co. of N.Y.*, 356 N.Y.S.2d 249, 255 (1974)). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Id.* at 186–87 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578, 579 (2d Dep't 1983)).

DeSimone has put forth sufficient evidence such that a reasonable jury could conclude she substantially performed under the mortgage agreement. First, she provides evidence that she made a total of 109 payments, often of more than $500 or $600, throughout the roughly 103 months between when SPS began servicing her mortgage in September 2014 and when it stopped in April 2023. (*See* Pls.' Sealed MSJ Opp'n, Dkt. 193, at 21–22; DeSimone Transaction History, Dkt. 193-15.) Second, she points to the SPS account history for her mortgage, which shows that her loan was designated by SPS as "current" rather than "in default" throughout the time SPS serviced it. (Pls.' Sealed MSJ Opp'n, Dkt. 193, at 22–23 (first citing Funk Dep. Excerpt, Dkt. 185-2, at ECF 19–20); then citing Pls.' MSJ Decl. Ex. 14 ("12/04/2024 Pulsipher Dep. Excerpt"), Dkt. 185-15, at ECF 13; and then citing DeSimone Account History Excerpt, Dkt. 193-13).) Third, DeSimone points to two loan modification agreements/forbearance plans that SPS offered and she accepted in 2022, arguing, in effect, that these modifications addressed her prior late or missed payments. (*See* Pls.' Sealed MSJ Opp'n, Dkt. 193, at 22; Pls.' MSJ Decl. Ex. 45 ("7/22/2022 DeSimone Letter"), Dkt. 193-28, at ECF 2 (three-month forbearance plan beginning July 19, 2022); Pls.' MSJ Decl. Ex. 46 ("12/23/2022 DeSimone Letter"), Dkt. 193-29, at ECF 2 (three-month forbearance plan beginning December 19, 2022).)[21] Finally, she cites SPS's records and

---

[21] Relatedly, Plaintiffs suggest, but do not explicitly argue, that SPS may have waived its right to timely payment from DeSimone under the mortgage agreement by failing to initiate foreclosure proceedings, which Plaintiffs describe as "the lender's contractual remedy for default."

deposition testimony showing that she had no past-due balance when SPS stopped servicing her loan in April 2023.  (Pls.' Sealed MSJ Opp'n, Dkt. 193, at 22 (first citing DeSimone Transaction History, Dkt. 195-15 (showing $0 balance); then citing Pls.' MSJ Decl. Ex. 22 ("Apr. 2023 DeSimone Mortg. Statement"), Dkt. 185-23 (showing amount due of $0); and then citing Pls.' MSJ Decl. Ex. 13 ("9/10/2024 Pulsipher Dep. Excerpt"), Dkt. 185-14, at ECF 12–13 (confirming DeSimone's loan was "not a default at SPS").)[22]

Resolving all ambiguities and drawing all permissible inferences in Plaintiffs' favor, a reasonable jury could conclude from this evidence that DeSimone had substantially performed under the contract.  *See Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 312 (2d Cir. 2016) (vacating district court's grant of summary judgment in favor of a defendant on a breach of contract claim where the judgment was based on plaintiff's alleged noncompliance with the contract; holding that the court does not need to determine that plaintiff substantially performed, "only that the record does not permit substantial performance to be rejected as a matter of law").  Therefore, SPS is not entitled to judgment as a matter of law on the

_____

(Pls.' MSJ Opp'n, Dkt. 185, at 23); *see also Wiener*, 113 F.4th at 215 ("In New York, contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." (citation modified)).  "Waiver 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'"  *JoySuds, LLC v. N.V. Labs, Inc.*, 668 F. Supp. 3d 240, 255 (S.D.N.Y. 2023) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 817 N.Y.S.2d 606, 611 (2006)); *see also id.* at 254–55 (on motion for judgment on the pleadings, holding that a plaintiff's failure to timely pay invoices as required by the contract did not bar plaintiff's breach of contract claims, based on (1) the doctrine of substantial performance and (2) the defendant's potential waiver, via its course of conduct, of its right to timely payment of the invoices).  However, since neither party briefed the issue of SPS's potential waiver, the Court does not address it further.

[22] The Court notes that SPS itself also acknowledges that "DeSimone had many QRPCs during the time SPS was servicing her loan," (Def.'s MSJ Mem., Dkt. 202, at 28), which is also evidence tending to support the conclusion that DeSimone was substantially or adequately performing under her mortgage agreement.

issue of DeSimone's performance, which is the second element of DeSimone's breach of contract claim.[23]

### 2.    Whether the Property Inspection Fees Breached the Contract

SPS next argues that it is entitled to summary judgment on DeSimone's breach of contract claim because it did not breach its contract with DeSimone. (*See* Def.'s MSJ Mem., Dkt. 202, at 13–15.) Rather, SPS argues, the inspection fees were expressly authorized by DeSimone's mortgage agreement. (*See id.*)

There are two provisions of DeSimone's mortgage agreement that might arguably authorize SPS to charge inspection fees: Section 9, which applies in the event DeSimone fails to "keep [her] promises and agreements made" in the mortgage agreement, (DeSimone Mortg., Dkt. 160-2, at ECF 11 § 9); and Section 14, which applies in the event of DeSimone's "default," (*id.* at ECF 14 § 14). SPS does not invoke Section 14, (*see* Def.'s MSJ Mem., Dkt. 202, at 13–15), perhaps in light of the evidence that DeSimone's mortgage was not classified as "in default" in SPS's system, (*see* Pls.' Sealed 56.1, Dkt. 193-1, ¶¶ 60–79). SPS instead argues that Section 9 "expressly authorized" it to inspect DeSimone's property and charge her associated fees. (Def.'s MSJ Mem., Dkt. 202, at 15.)

The Court disagrees. The term "express" is commonly defined as explicit, clear, direct, or firm, in contrast to implicit. *See Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409, 419 n.12 (E.D.N.Y. 2013) ("'Express' means 'explicit,' not . . . 'implicit.'" (quoting *Edeh v.*

---

[23] Plaintiffs argue that "non-performance of a contract term is a defense to non-performance of another *only* when the two provisions are dependent," (Pls.' MSJ Opp'n, Dkt. 185, at 19), and suggest that the mortgage's fees provisions are independent from the mortgage's payment provisions, (*see id.* at 20–21). Because the Court denies summary judgment on the issue of DeSimone's performance based on the doctrine of substantial performance, it does not address Plaintiffs' argument about the doctrine of mutually dependent covenants.

*Midland Credit Mgmt.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010))); *Bahrain Ins. Co. v. M/V Trein Maersk*, No. 81-CV-2167 (MEL), 1983 WL 634, at *9 (S.D.N.Y. Oct. 5, 1983) ("[A]s an adjective, [express] is defined as 'directly, firmly and explicitly stated.'" (quoting Webster's New Collegiate Dictionary (1979))). Section 9 makes no explicit, clear, direct, or firm reference to inspection fees. (*See* DeSimone Mortg., Dkt. 160-2, at ECF 11 § 9.) Section 9 provides examples of actions that the lender might take and charge DeSimone for, if reasonable or appropriate, including "protecting and/or assessing the value of the Property," "securing and/or repairing the Property," "paying sums to eliminate any Lien against the Property," "appearing in court," and "paying reasonable attorneys' fees to protect its interest in the property." (*See id.*) While inspection fees arguably might be *implicitly* authorized under this Section, they are not *expressly* authorized as SPS claims.

Moreover, Section 9 does not give SPS carte blanche to do whatever it pleases at the borrower's expense; it authorizes SPS to do, and charge DeSimone for, only what is "reasonable or appropriate to protect [the] [l]ender's interest in the [p]roperty." (*Id.*) SPS's argument that this provision "expressly authorized" it to inspect DeSimone's property and charge her the inspection fees, (Def.'s MSJ Mem., Dkt. 202, at 15), begs the question: it assumes that SPS's inspections were "reasonable or appropriate," which is the very issue that needs to be resolved in this case. Put differently, SPS argues that Section 9 expressly authorizes any and all inspection fees as "reasonable or appropriate." That is incorrect. Section 9 *implicitly* authorizes only those inspection fees that *are*, in fact, "reasonable or appropriate."

This Court has already held, albeit in the motion-to-dismiss context, that "[w]hether Defendant SPS's imposition of inspection fees was objectively reasonable is a question of fact best reserved for the jury." *Evans*, 2020 WL 5848619, at *10 (citing *Pettitt v. Chiari & Ilecki, LLP*,

26

419 F. Supp. 3d 627, 636 (W.D.N.Y. 2019)).  That is still true now.  There are still facts in dispute that are material to a determination of how reasonable the inspection fees were: for example, the parties dispute whether SPS followed its internal policies and procedures when charging inspection fees, (Pls.' Resp. 56.1, Dkt. 186, ¶ 10); whether SPS's internal policies instructed SPS not to charge borrowers for property inspections if SPS had been in contact with the borrower in the last 30 days or if the borrower had made a payment within 30 days, (*see* Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶ 65; Def.'s Sealed Resp. 56.1, Dkt. 198, ¶¶ 36, 42, 44); whether SPS charged DeSimone more than the actual cost of the inspections, (Pls.' Resp. 56.1, Dkt. 186, ¶¶ 36, 54, 59); and whether SPS considered DeSimone's loan to be delinquent when it ordered the inspections or charged her the inspection fees, (*see* Pls.' Sealed Resp. 56.1, Dkt. 193-1, ¶¶ 56–58, 61–63, 94).  In light of these material factual disputes, summary judgment is inappropriate.[24]

---

[24] SPS's argument for why it did not breach the contract is focused on its interpretation of the mortgage agreement as "expressly permitt[ing]" SPS to conduct inspections and charge fees, (*see* Def.'s MSJ Mem., Dkt. 202, at 14–15), and so the Court has focused its discussion above on its disagreement with that assertion.  Although SPS also states that "a breach of contract claim fails as a matter of law in the absence of any showing that a specific provision of the contract was breached," (*id.* at 13 (citations and internal quotation marks omitted)), it does not argue that DeSimone has failed to point to a specific provision of her mortgage agreement that *prohibits* the fees.  That argument is therefore forfeited.  *See Palmese v. N.Y.C. Dep't of Educ.*, No. 24-CV-5915 (PKC) (JRC), 2026 WL 265962, at *7 (E.D.N.Y. Feb. 2, 2026) ("Where a party refers to an issue in only a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived—or, more precisely, *forfeited*." (quoting *O'Sullivan v. PHH Mortg. Corp.*, No. 2:22-CV-4420 (NJC) (ARL), 2025 WL 1835926, at *16 (E.D.N.Y. July 3, 2025))).  Nonetheless, even if the Court were to consider that argument, the Court finds it unavailing.  Section 14 of DeSimone's mortgage agreement prohibits the lender from charging any fees that are prohibited by applicable law.  (DeSimone Mortg., Dkt. 160-2, at ECF 14 § 14.)  If SPS's inspection fees were assessed in violation of the FDCPA, then a reasonable jury could conclude that SPS violated that prohibition in the mortgage agreement.  *See DeSimone v. Select Portfolio Servicing, Inc.*, 748 F. Supp. 3d 136, 175 (E.D.N.Y. 2024) (explaining that a fee charged in violation of the FDCPA is a violation of "applicable law" and therefore would "necessarily" constitute a breach of this same exact mortgage provision).

**C.       DeSimone's Covenant of Good Faith and Fair Dealing Claim Survives Summary Judgment**

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance." *Cordero v. Transamerica Annuity Serv. Corp.*, 190 N.Y.S.3d 274, 281 (2023) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 746 N.Y.S.2d 131, 135 (2002) (collecting cases)).  The implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 639 N.Y.S.2d 977, 979 (1995)).  The implied covenant includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract, *Dalton*, 639 N.Y.S.2d at 979 (quoting *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 412 N.Y.S.2d 827, 831 (1978)), and when "the contract contemplates the exercise of discretion," the implied covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion," *id.* (citing *Tedeschi v. Wagner Coll.*, 427 N.Y.S.2d 760, 763 (1980)).  "A breach of the covenant is considered a breach of the underlying contract" under New York law.  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 817 (2d Cir. 2014) (citing *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)); *accord Jennifer Realty*, 746 N.Y.S.2d at 136 (holding that plaintiffs "pleaded a valid cause of action for breach of contract" by alleging a breach of the implied covenant).

SPS argues that it is entitled to summary judgment on DeSimone's implied covenant claim for two reasons: (1) it is duplicative of her breach of contract claim, and (2) "the undisputed facts show that SPS acted within its discretion in conducting the inspections . . . and seeking the expenses from DeSimone."  (Def.'s MSJ Mem., Dkt. 202, at 16.)  The Court disagrees.

28

1.      Whether the Implied Covenant Claim is Duplicative

SPS argues that "[b]ecause DeSimone's claims for breach of contract and breach of the implied covenant are premised on the same factual allegations, the latter is duplicative of the former and cannot be sustained on a motion for summary judgment." (Def.'s MSJ Mem., Dkt. 202, at 17.)

The Court has already assessed and rejected Defendant's argument. On November 4, 2024, after consolidating DeSimone's claims into this case, the Court ordered Plaintiffs to "show cause as to why DeSimone's [implied covenant] claim should not be dismissed," given that the Court had dismissed this claim as redundant in a separate but related case filed by DeSimone, *see DeSimone*, 748 F. Supp. 3d at 177–78, and given that the Court had also dismissed Evans's implied covenant claim in this case for the same reason, *see Evans*, 2020 WL 5848619, at *16–17. (O.S.C., Dkt. 148, at 2.) The Court was ultimately persuaded by DeSimone's argument that DeSimone's implied covenant claim may proceed as an alternative to her breach of contract claim, (*see* Pls.' O.S.C. Resp., Dkt. 153, at 7–8 (citing *Sorotzkin v. EmblemHealth Inc.*, No. 22-3194, 2023 WL 7383169, at *2 (2d Cir. Nov. 8, 2023) (summary order)); *see also* Pls.' MSJ Opp'n, Dkt. 185, at 26 n.8 ("DeSimone . . . does not seek duplicative recovery on both claims.")), and therefore granted Plaintiffs leave to file an amended complaint that included both DeSimone's breach of contract and implied covenant claims, (1/08/2025 Dkt. Order). The following month, SPS filed a PMC request in advance of an anticipated motion to dismiss, arguing, *inter alia*, that "DeSimone's breach of implied covenant claim must . . . be dismissed as duplicative of her breach of contract claim because the former is premised on the same factual allegations as the latter." (Def.'s PMC Request, Dkt. 163, at 3.) As described *supra*, the Court construed the PMC request as a motion to dismiss and denied the motion from the bench. (*See* 3/13/2025 Min. Entry; *see also* Pls.' MSJ Decl. Ex. 53 ("3/14/2023 Hr'g Tr. Excerpt"), Dkt. 185-54, at ECF 5 (the Court expressing

29

"surprise[] that we're even here . . . because, in my view, I've effectively ruled on the two proposed issues that the Defendants would want to move on at this point").[25]

Nonetheless, the Court again rejects SPS's argument. Applying New York law, the Second Circuit has previously stated that "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n.17 (2d Cir. 2011)). More recently, however, the Second Circuit has clarified that "this anti-duplication rule 'does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing' alongside a claim for express breach of contract when those claims 'are brought in the alternative.'" *Sorotzkin*, 2023 WL 7383169, at *2 (quoting *Fantozzi v. Axsys Techs., Inc.*, No. 07-CV-2667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)). "That is because under the rule '[a] party is only precluded from recovering on both theories at the same time.'" *Id.* (alteration in original) (citing *Fantozzi*, 2008 WL 4866054, at *7).

The Court recognizes that in this case as well as others, the Court has dismissed implied covenant claims as duplicative of breach of contract claims under New York law. *See, e.g.*, *Evans*, 2020 WL 5848619, at *16–17; *DeSimone*, 748 F. Supp. 3d at 177–78; *Acranom Masonry, Inc. v. Wenger Constr. Co., Inc.*, No. 14-CV-1839 (PKC) (RML), 2019 WL 3798047, at *16 (E.D.N.Y. Aug. 13, 2019). In the present context, however, where DeSimone is expressly *not* seeking to

---

[25] Given this ruling with respect to DeSimone's implied covenant claim, the Court *sua sponte* reconsiders and vacates its dismissal of Evans's implied covenant claim with the caveat that Evans cannot recover for both claims. The impact of this ruling, if any, will depend on whether the Court ends up certifying a class for purposes of DeSimone's implied covenant claim, because Evans might be a member of such a class. *See infra* § II.B (discussing Plaintiffs' request for class certification).

30

recover on both claims, (*see* Pls.' MSJ Opp'n, Dkt. 185, at 26 n.8), the Court holds that the implied covenant claim may be pleaded in the alternative. Federal courts sitting in diversity, as this Court is, (*see* SAC, Dkt. 160, ¶ 9 (alleging jurisdiction pursuant to 28 U.S.C. § 1332)), "apply state substantive law and federal procedural law" under the *Erie* doctrine. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111–12 (2d Cir. 2013) (quoting *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 150 (2d Cir. 1998) (per curiam)). New York substantive law treats implied covenant claims as a form of breach of contract claim. *See, e.g.*, *Sec. Plans*, 769 F.3d at 817 (explaining that a breach of the implied covenant under New York law "is considered a breach of the underlying contract"). But federal procedural law allows the Court to treat the two claims as pleaded and pursued in the alternative. *See* Fed. R. Civ. P. 8(d)(2) (permitting parties to advance multiple theories in support of a single claim "alternatively or hypothetically, either in a single count . . . or in separate ones").[26] In any event, since DeSimone is not seeking duplicative recovery, there is little practical difference between whether she pleads her implied covenant claim separately from or as a part of her breach of contract claim. *See, e.g.*, *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 164 N.Y.S.3d 108, 123 (1st

---

[26] The Court also notes that even New York state courts applying New York procedural law have held in some instances that implied covenant claims may proceed alongside breach of contract claims premised on the same facts if the implied covenant claim is pleaded in the alternative. *See, e.g.*, *URP Maiden Lane LLC v. Nat'l Valley Bank*, 248 N.Y.S.3d 28, 30 (1st Dep't 2025) ("The [implied covenant] cause of action was not duplicative of the breach of contract cause of action because it alleged conduct separate from the breach of contract claim and, *in any event*, was pleaded in the alternative" (emphasis added)); *Botbol v. Frosh Int'l Travel Inc.*, 201 N.Y.S.3d 387, 389 (1st Dep't 2023) ("Although these allegations formed part of plaintiff's breach of contract claim, to the extent the allegations, if true, may not have constituted a breach of contract, they are separate from that claim and in any event pleaded in the alternative. Thus, plaintiff's claim for breach of the covenant of good faith and fair dealing, which repeats these allegations, is not duplicative of his breach of contract claim."). *See also Audthan LLC v. Nick & Duke, LLC*, 219 N.Y.S.3d 600, 608 (2024) ("A plaintiff, of course, is permitted to plead in the alternative." (citing N.Y. C.P.L.R. 3014, 3017)).

Dep't 2022) ("Because a breach of the covenant of good faith and fair dealing is a breach of the contract itself, plaintiffs may press their theory that defendants acted in derogation of the covenant in conjunction with their cause of action for breach of the [contract]."); *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Ent. Corp.*, 80 F. Supp. 3d 507, 520 (S.D.N.Y. 2015) (treating breach of contract claims and implied covenant claim under New York law as a single claim with multiple theories of recovery).[27]

### 2.    Whether SPS Breached the Implied Covenant

SPS argues, in effect, that because the mortgage agreement expressly authorized it to charge inspection fees, such fees could not have breached any implied covenant in the contract. (*See* Def.'s MSJ Mem., Dkt. 202, at 17–18.)  However, as discussed *supra*, the Court disagrees that the mortgage agreement expressly permitted SPS to charge the inspection fees at issue, and thus this argument is largely moot.  Assuming *arguendo* that the property inspection fees did not breach an express term of the mortgage agreement, there is still a question as to whether SPS exercised its discretion under the contract arbitrarily, irrationally, or in bad faith by charging the fees.  That is the alleged violation of the implied covenant.  (*See* Pls.' MSJ Opp'n, Dkt. 185, at 26–27.)  And the same disputed facts that bear on whether the property inspection fees were "reasonable or appropriate," discussed *supra*, are also material to whether the fees were assessed arbitrarily, irrationally, or in bad faith.  Again, these disputed material facts preclude the Court from concluding that DeSimone's breach of implied covenant claim fails as a matter of law. Summary judgment on DeSimone's implied covenant claim is therefore inappropriate.

---

[27] The Court notes, however, that Plaintiffs seemingly will have to decide how they intend to pursue these two claims for purposes of seeking class certification.  If, for example, Plaintiffs merely intend to argue their implied covenant theory to prove their breach of contract claim, then a separate implied covenant class might not need to be certified.  But, as noted *infra*, § II.B., Plaintiffs have yet to address that issue.

**D.      Plaintiffs' FDCPA Claims Survive Summary Judgment**

The FDCPA was enacted in 1977 "based on Congress' findings that debt collection abuses are serious and widespread, and a finding by the National Commission on Consumer Finance, referred to in the legislative history, which showed that the 'vast majority of consumers who obtain credit fully intend to repay their debts.'" *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) (quoting S. Rep. No. 95-382, at 3 (1977)).  "Because the FDCPA is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 134 (2d Cir. 2017) (quoting *Vincent v. Money Store*, 736 F.3d 88, 98 (2d Cir. 2013)).  In order to state an FDCPA claim, a plaintiff must plead that (1) they are a "consumer who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt"; (2) "the defendant collecting the debt is considered a 'debt collector'" within the meaning of the FDCPA; and (3) "the defendant has engaged in any act or omission in violation of [the] FDCPA['s] requirements." *Zirogiannis*, 221 F. Supp. 3d at 302.

Plaintiffs bring claims under two FDCPA provisions: 15 U.S.C. § 1692f ("Section 1692f"), and 15 U.S.C. § 1692e ("Section 1692e").  (SAC, Dkt. 160, ¶¶ 104–07.)  Section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  As relevant here, this section specifically proscribes debt collectors from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  *Id.* § 1692f(1).

Section 1692e "bars the general use of any 'false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Russell*, 74 F.3d at 33 (quoting 15 U.S.C. § 1692e).  Specifically, Section 1692e(2)(A) prohibits "false representation[s]" of "the character,

33

amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), and Section 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt," *id.* § 1692e(10).  A violation of Section 1692f(1) is also, in most cases, a violation of Sections 1692e(2) and 1692e(10), because the act of charging a borrower an unlawful fee, and subsequently providing documentation of that fee to the borrower, falsely represents to the borrower that the fee is permissible under the law.  *See DeSimone*, 748 F. Supp. 3d at 166–67 (collecting cases).

SPS moves for summary judgment against both DeSimone and Evans on their FDCPA claims.  (Def.'s MSJ Mem., Dkt. 202, at 19–29.)  For the following reasons, the Court denies SPS's motion against both DeSimone and Evans.

### 1.    DeSimone's FDCPA Claims

As to DeSimone, SPS raises no argument that the Court has not already rejected.  (*See* Def.'s MSJ Mem., Dkt. 202, at 27–28 (arguing that DeSimone's mortgage agreement expressly authorized the inspection fees and that the inspection fees were reasonable as a matter of law).)[28] The Court need not spend any more time discussing why these arguments fail.  Summary judgment on DeSimone's FDCPA claims is denied.

### 2.    Evans's FDCPA Claims

As to Evans, SPS argues that (1) some, but not all, of the property inspection fees SPS charged Evans are barred by the statute of limitations, (Def.'s MSJ Mem., Dkt. 202, at 19–20);

---

[28] SPS also makes several arguments based on assertions of fact that are disputed. (*Compare* Def.'s Sealed MSJ Mem., Dkt. 192, at 28 (arguing that DeSimone "had not had a [QRPC] with SPS within the prior thirty days" of the inspection fees), *with* Def.'s Sealed Resp. 56.1, Dkt. 198, ¶¶ 37–38, 40–41 (parties disputing the nature of DeSimone's contacts with SPS in the relevant periods and whether SPS even tracks whether a contact is a QRPC); *compare* Def.'s MSJ Mem., Dkt. 202, at 28 (arguing that "the evidence shows . . . that SPS charged DeSimone the exact amounts for those inspections that it incurred"), *with* Pls.' Resp. 56.1, Dkt. 186, ¶ 36 (presenting conflicting factual evidence about the amount SPS paid for the inspections).)

34

(2) Evans's FDCPA claim is barred by the *Rooker-Feldman* doctrine based on the state court foreclosure judgment against Evans, (*id.* at 20–21); (3) Evans's FDCPA claim fails because it is "not predicated on a communication by SPS made in connection with the collection of a debt," (*id.* at 21); and (4) SPS's inspection fees were authorized by Evans's mortgage agreement, (*id.* at 23–27).  All of these arguments are meritless.

As to SPS's first argument, as SPS admits, Evans was charged at least one inspection fee that is timely under the FDCPA's one-year statute of limitations.  (*See* Def.'s MSJ Mem., Dkt. 202, at 20 (stating that "one of the charges identified in the Complaint was assessed within one year of the initial filing of Evans's FDCPA complaint")); 15 U.S.C. § 1692k(d) ("An action [under this subchapter] may be brought . . . within one year from [when] the violation occurs."); *see also Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 79 (2d Cir. 2019) ("[A]n FDCPA violation occurs, triggering the statute of limitations, when an individual is injured by unlawful conduct.").  Evans makes clear that he "does not claim FDCPA violations for the earlier inspection fees" that fall outside the statute of limitations.  (Pls.' MSJ Opp'n, Dkt. 185, at 11.)  And even "a single violation of the FDCPA is sufficient to impose liability." *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 133 (2d Cir. 2010).  Summary judgment against Evans on this basis is therefore unwarranted.

SPS's second argument is also unavailing.  The *Rooker-Feldman* doctrine "bars federal district courts from hearing cases that in effect are appeals from state court judgments, because the Supreme Court is the only federal court with jurisdiction over such cases." *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021) (citing 28 U.S.C. § 1257).  In order for the doctrine to apply, four requirements must be met:

(1) the federal-court plaintiff must have lost in state court;

(2) the plaintiff must complain of injuries caused by a state-court judgment;

(3) the plaintiff must invite [federal] district court review and rejection of that judgment; and

(4) the state-court judgment must have been rendered before the [federal] district court proceedings commenced.

*Id.* (citation modified) (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005)).  Here, even assuming, without deciding, that the injuries Evans complains of in this case were caused by the state court judgment, Evans plainly initiated these proceedings before the alleged foreclosure judgment in the state court case was issued.  (*Compare* Class Action Compl., Dkt. 1 (filed on October 25, 2018), *with* Def.'s MSJ Mem., Dkt. 202, at 21 (stating that the state court issued a final judgment against Evans on November 28, 2018).)[29]  SPS's invocation of the *Rooker-Feldman* doctrine therefore fails.

SPS's third argument is also meritless.  SPS argues that Evans's FDCPA claim cannot be sustained under Section 1692e because it is not premised on a "communication by SPS made in connection with the collection of a debt."  (Def.'s MSJ Mem., Dkt. 202, at 21.)  SPS bases this argument on Evans's deposition testimony that "the basis for his FDCPA claim is SPS's response to a qualified written request ('QWR') that Evans sent to SPS."  (*Id.*)  SPS is incorrect.  As Plaintiffs explain, "Evans'[s] FDCPA claim is predicated on SPS's monthly mortgage statements reflecting the inspection fee charges."  (Pls.' MSJ Opp'n, Dkt. 185, at 13 (citing Dec. 2017 Evans Insp. Report, Dkt. 185-35; Pls.' MSJ Opp'n Ex. 35 ("Oct. 2018 Evans Insp. Report"), Dkt. 185-36).)  Evans is a layperson, and his deposition testimony on a legal question—the basis

---

[29] Plaintiffs dispute whether the judgment from the state court case is a "final" judgment. (*See* Pls.' MSJ Opp'n, Dkt. 185, at 11–12.)  Having found that the *Rooker-Feldman* doctrine does not apply regardless, the Court need not reach this argument.

for his FDCPA claim—"is entitled to no weight at summary judgment." *See Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 96 (2d Cir. 2015).

Finally, the Court has already rejected SPS's fourth argument, that Section 9 of Evans's mortgage agreement authorized the property inspection fees, as a basis for summary judgment.[30]

\* \* \*

In sum, SPS's arguments in favor of summary judgment are unavailing, and there are disputed issues of material fact that preclude summary judgment on all remaining claims in this case. SPS's motion for summary judgment is therefore denied in its entirety.

## II. Plaintiffs' Class Certification Motion

### A. Legal Standard

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). That entails satisfying all of the provisions of Rule 23(a), as well as "at least one of the provisions of Rule 23(b)." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Before certifying a class, a district court must conduct a "rigorous analysis" to determine whether each Rule 23 requirement has been met. *See Comcast*, 569 U.S. at 33 (citation omitted). In doing so, the court must consider "all of the relevant evidence admitted at the class certification stage." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006), *decision clarified*

---

[30] Since SPS does not argue that the property inspection fees charged to Evans were authorized by Section 14 of his mortgage agreement, (*see* Def.'s MSJ Mem., Dkt. 202, at 24 (invoking only Sections 7 and 9)), that argument is waived and the Court does not address it. *See Espinoza v. Foundry Workers LLC*, 792 F. Supp. 3d 344, 353 (E.D.N.Y. 2025) (holding that argument party failed to raise in summary judgment papers was waived and/or forfeited (collecting cases)).

*on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007).  The court must "resolve material factual disputes relevant to each Rule 23 requirement and must find that each requirement is established by at least a preponderance of the evidence."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (citation modified).

"The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification."  *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 254 (E.D.N.Y. 2019) (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011)).  Thus, "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969)).

The class certification analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Comcast*, 569 U.S. at 33–34 (citation and internal quotation marks omitted).  That said, questions on the merits must be considered "only to the extent . . . they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## B.   Plaintiffs' Requested Class Certification

Plaintiffs seek to certify the following classes with DeSimone as the class representative for each:

1.   Upcharge Class: "All borrowers nationwide whom SPS charged [property] inspection fees in an amount greater than the cost of the inspections charged by inspection vendors Safeguard and ServiceLink";

2.   FDCPA Class: "All borrowers nationwide to whom SPS stated in letters when SPS began servicing the loan that the loans were in default or past due AND: (1) had an inspection fee added to the loan when the inspection of the property did not conclude the home was Vacant or Abandoned; or (2) had an inspection fee added to the loan that was charged within 30 days of SPS's Account Notes reflecting contact with or from the borrower (including a promise to pay)"; and

3.   Breach of Contract Class: "All borrowers nationwide whose loans are not currently in a Loan Status of Default or Foreclosure or did not have a Loan Status of Default or Foreclosure when SPS ceased servicing their loans AND: (1) had an inspection fee added to the loan when the inspection of the property did not conclude the home was Vacant or Abandoned; or (2) had an inspection fee added to the loan that was charged within 30 days of SPS's Account Notes reflecting contact with or from the borrower (including a promise to pay)."

(Pls.' Class Cert. Mot., Dkt. 183, at ECF 1–2.)  The proposed classes exclude "(1) SPS's officers, directors, employees, and agents as well as any outside counsel in this litigation; (2) any judge to whom this case is assigned, along with his or her staff; and (3) immediate family of any individual excluded by (1) or (2)."  (Pls.' Class Cert. Mem., Dkt. 183, at 2–3.)  Regarding the class periods, Plaintiffs state that "for the FDCPA claim, the class period begins on October 25, 2017," which is one year prior to when Plaintiffs initiated this case, and "[f]or the breach of contract claim, the class period corresponds to the state where the property is located."  (Id. at 2.)[31]  The following three firms ask to be appointed co-lead class counsel: Lieff, Cabraser, Heiman & Bernstein, LLP;

---

[31] Plaintiffs do not include a class period for the proposed Upcharge Class.  (See generally Pls.' Class Cert. Mem., Dkt. 183, at 2.)

Tusa P.C.; and Giskan Solotaroff & Anderson LLP. (*Id.* at 24–25; Pls.' Class Cert. Mot., Dkt. 183, at ECF 2.)

As set forth below, the Court concludes that the proposed classes likely satisfy the requirements of Rule 23(a), but the Court cannot conclusively determine whether Plaintiffs have met their burden with respect to those requirements because there are problems with the proposed class definitions that render the classes unascertainable. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288, at *4 (S.D.N.Y. Apr. 4, 2017) (explaining that the court cannot "reliably assess the parties' positions on questions of commonality, adequacy, and predominance[,] among other things," without addressing issues with the ascertainability of the proposed class (collecting cases)). Relatedly, the Court cannot conclude that the proposed classes, as currently defined, meet the requirements of Rule 23(b).

1.      Rule 23(a)(1): Numerosity

First, Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Within the Second Circuit, "[n]umerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014), *as amended* (Nov. 12, 2014) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Here, Plaintiffs assert that the proposed classes consist of hundreds of thousands of individuals. (*See* Pls.' Class Cert. Mem., Dkt. 183, at 12 (citing Pls.' Class Cert. Decl., Dkt. 183-1, ¶ 36).) SPS does not contest that Plaintiffs' proposed classes meet the numerosity requirement of Rule 23(a)(1). (*See generally* Def.'s Class Cert. Opp'n, Dkt. 207; *see also* Pls.' Class Cert. Reply, Dkt. 190, at 1 n.1 ("SPS has not disputed that Plaintiffs satisfy Rule 23(a)(1) . . . .").) Plaintiffs have therefore demonstrated that the proposed classes likely meet the numerosity requirement of Rule 23(a)(1).

40

2.       Rule 23(a)(2): Commonality

Second, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question" is enough. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (citation modified). To warrant class certification, however, that common question must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. In other words, "[w]hat matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs' overarching claim is that SPS ordered unnecessary and improper home inspections and then charged Plaintiffs unreasonable inspection fees, (*see* Pls.' Class Cert. Mem., Dkt. 183, at 1)—the same fee, "albeit millions of times," (*see id.* at 2). The crux of their argument is that the fees were unlawful because Plaintiffs' uniform mortgage agreements do not authorize such fees. (*See id.* at 16–20.)[32] The question of whether SPS's inspection fees were authorized under those uniform mortgage agreements is apt for class-wide adjudication, because its resolution is "central to the validity of each one of [Plaintiffs'] claims." *Wal-Mart*, 564 U.S. at 350. Based on this theory, the Court concludes that Plaintiffs are likely to satisfy commonality, so long as all

---

[32] The FDCPA theory relies on the terms of class members' uniform mortgage agreements because the relevant provision of the FDCPA prohibits debt collectors from collecting any fee unless authorized by law *or* the terms of the instrument creating the debt. *See* 15 U.S.C. § 1692f(1). Plaintiffs argue that the fees were not authorized by law, so whether they were unlawful under the FDCPA depends on whether they were authorized by Plaintiffs' mortgage agreements. (*See* Pls.' Class Cert. Mem., Dkt. 183, at 1, 18–19.)

class members have uniform mortgage agreements, and this limitation is made part of the class definitions, as discussed further *infra.*

SPS's arguments against commonality are unpersuasive.  SPS argues that the FDCPA and Breach of Contract Classes do not satisfy commonality because each member of these classes would be "subject to a variety of defenses and issues . . . which would require the Court to engage in individual fact inquiries for each class member."  (Def.'s Class Cert. Opp'n, Dkt. 207, at 14 (citation and internal quotation marks omitted).)  That argument overstates what Rule 23(a)(2) requires.  Commonality does not mean that all class members must be identical with respect to all of the applicable claims and defenses.  *See Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) ("[T]he claims for relief need not be identical for them to be common." (quoting *Nextel Commc'ns*, 780 F.3d at 137)); *see also* Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:7 (22nd ed. 2025) ("Commonality is not the inquiry that examines and weighs the significance of non-common questions; that question is addressed under the predominance inquiry [of Rule 23(b)(3)].").  Indeed, as the Second Circuit has held regarding the Rule 23(b)(3) predominance inquiry—which overlaps with and is even more demanding than the Rule 23(a)(2) commonality inquiry, *see* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:27 (6th ed. Dec. 2025)— the existence of individual defenses "does not compel a finding that individual issues predominate over common ones."  *Nextel Commc'ns*, 780 F.3d at 138 (citation omitted).

The primary case SPS relies on, *Frey v. Bekins Van Lines*, No. 09-CV-5430 (LDW), 2012 WL 1107719 (E.D.N.Y. Apr. 2, 2012), is distinguishable.  There, the plaintiffs alleged that defendant shipping companies "engaged in a pattern and practice of quoting lower shipping prices than those ultimately charged," otherwise known as low-balling.  2012 WL 1107719, at *1.  They sought to certify a class including all persons or entities who shipped goods via the defendant

42

companies and who paid in excess of 110% of the estimate received. *See id.* at *5. They argued that damages would be calculated by "comparing computerized records of estimated shipping costs versus actual costs billed." *Id.* But, as the court there observed, the nature of the "estimated" cost provided in the first instance meant that it was "entirely likely" that many of the shipments in fact *weighed more* than the *estimated weight*, which would mean that their final shipping cost would be higher than the estimated cost without any potential wrongdoing on defendants' part. *See id.* at *6. Accordingly, the plaintiffs could not establish that a broad policy of low-balling would "entitle[] each and every shipper to recoup an amount equal to the difference between the estimated and actual cost of shipping." *Id.* The court therefore concluded that common issues did not "predominate" or "render a class action superior or manageable," *id.*, which are the requirements of Rule 23(b)(3), not Rule 23(a)(2). As the court explained, the "key issue" in that case could not be answered on a class-wide basis: "whether any and all differences between estimated costs and actual cost billed can be attributed" to the low-balling practice. *Id.* Here, in contrast, the "key issue" is class-wide: whether SPS's standard policy of charging a set fee for property inspections, ordered pursuant to a standardized formula, violated the borrowers' uniform mortgage terms, given certain common circumstances (such as the borrowers being in recent contact with SPS or making a recent payment to SPS). That issue can and should be resolved on a class-wide basis.

The other case SPS cites, *Felix v. NorthStar Location Services, LLC*, 290 F.R.D. 397 (W.D.N.Y. 2013), is similarly inapposite. There, the court concluded that the proposed class lacked commonality because the proposed class definition encompassed, *inter alia*, all class members to whom the defendant "made a false representation or used a deceptive means to collect or attempt to collect any debt" in violation of the FDCPA. 290 F.R.D. at 401–04. Because that definition parrots the language of the FDCPA, the court correctly noted that it could not ascertain

43

who was in or out of the class without conducting mini-hearings into the merits of each individual's claims. *Id.* The proposed class definitions here do not suffer from that flaw.

### 3. Rule 23(a)(3): Typicality

Third, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Hasemann*, 331 F.R.D. at 268 (quoting *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012)). Typicality is established where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

Although the Court cannot determine typicality conclusively because, again, the proposed classes are not ascertainable, the Court believes that the questions underlying DeSimone's claims are likely to be typical of the questions that underlie the claims of the other proposed class members: whether the property inspection fees SPS charged her were reasonable given that (1) she was in contact with SPS within the last 30 days; (2) she had paid or scheduled a payment to SPS within the last 30 days; (3) the property inspections concluded that her property was not vacant or abandoned; and (4) as she contends, the fees were inflated above their actual cost. (*Compare* Pls.' Class Cert. Mem., Dkt. 183, at 2 (defining the classes to include borrowers who either were in contact with SPS within the last 30 days of being charged the fee, or who had a fee added where the inspection concluded that their property was not vacant or abandoned, or who were charged a fee in an amount greater than the cost of the inspections), *with id.* at 14 (asserting that DeSimone, too, was charged inspection fees "within 30 days of being in contact with SPS," when the

44

inspections confirmed that her property was occupied, and was charged "above the cost of the inspections").)  The other class members' injuries apparently stem from the same course of conduct as DeSimone's, their legal arguments for SPS's liability would be the same as or similar to hers, and DeSimone has an incentive to prove all of the elements of the cause of action that other class members would present in their own individualized actions.  DeSimone is therefore likely to be a "typical" representative of the classes.  *See Shahriar*, 659 F.3d at 252; *Hasemann*, 331 F.R.D. at 268.

SPS argues that DeSimone is not typical because "she was in breach of her mortgage obligations when SPS ordered the two inspections at issue."  (Def.'s Class Cert. Opp'n, Dkt. 207, at 10.)  Thus, SPS argues, her breach of contract claim is "subject to a unique defense" of non-performance, (*id.* at 10–11), and her FDCPA claim is subject to the defense that the inspection fees were authorized under the terms of her mortgage, (*id.* at 11).  However, the Court agrees with Plaintiffs that SPS's argument is essentially a "common (i.e., non-unique) merits defense" about whether SPS could reasonably charge inspection fees for borrowers whom SPS believed were past-due on their mortgage payments, and "is [thus] not atypical."  (Pls.' Class Cert. Reply, Dkt. 190, at 7); *see Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 534 (E.D.N.Y. 2017) ("Where a defense applicable to a class representative may also be widely applicable to members of the class, the presence of such a defense is not atypical.").[33]

---

[33] SPS argues, relatedly, that DeSimone cannot be the class representative for any of the three proposed classes because she lacks standing for two reasons. (*See* Def.'s Class Cert. Opp'n, Dkt. 207, at 8–9.) First, SPS claims that DeSimone suffered no injury because she was not, in fact, upcharged for the property inspections. (*See id.* at 9.) But disputed facts remain over whether DeSimone was upcharged. (*See* Pls.' Resp. 56.1, Dkt. 186, ¶¶ 45, 54, 67, 79, 91.) If she *was*, that certainly could be a cognizable injury (if, for example, the upcharge was not permitted by law or expressly authorized under her mortgage agreement, *see* 15 U.S.C. § 1692f(1)). This argument is therefore properly considered as a merits defense, not a standing issue. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 82 n.6 (2d Cir. 2018) (dismissing argument that plaintiff

4.      Rule 23(a)(4): Adequacy

Fourth, Rule 23(a)(4) requires the Court to determine whether the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A]dequacy of representation entails [an] inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).[34] "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

---

lacked standing because the alleged FDCPA violation was not sufficiently material and explaining that "we do not consider this merits issue as part of our standing analysis"); *see also Zirogiannis*, 221 F. Supp. 3d at 299–303 (holding that an alleged FDCPA notice violation constituted an injury in fact sufficient to confer standing, even though the alleged injury was abstract and intangible (unlike here) and even though the court proceeded to hold on the merits that plaintiff had not actually established the FDCPA violation). Second, SPS argues that Plaintiff DeSimone was "past due on her mortgage payments" when it ordered the inspections, that her mortgage authorized SPS to do what was "reasonable or appropriate" to protect its interests in the property, and thus it "did not act unreasonably" in ordering the inspections. (Def.'s Class Cert. Opp'n, Dkt. 207, at 9.) This argument, aside from being a merits defense, is also tautological, as discussed *supra*, § I.B.2. (denying summary judgment on DeSimone's breach of contract claim).

[34] Since 2003, the adequacy of proposed class counsel has been governed by Rule 23(g), which requires the Court to appoint class counsel that will "fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(4), after considering "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class," *id.* at R. 23(g)(1)(A). *See* 3 Rubenstein, *supra*, § 3:80 (discussing relationship between Rule 23(a)(4) and Rule 23(g)). Rule 23(g) "may fairly be understood as an implicit incorporation of the case law previously developed by courts under Rule 23(a)(4)," as the standard is largely the same, and "Rule 23(a)(4) precedents relating to the adequacy of class counsel have been easily adopted into the Rule 23(g) analysis." *Id.*

46

As to Plaintiff DeSimone, SPS's adequacy arguments are the same as its typicality arguments. (*See* Def.'s Class Cert. Opp'n, Dkt. 207, at 15–16 ("DeSimone is not an adequate class representative . . . because, as discussed *supra*, she is subject to a unique defense . . . .").) Having rejected those arguments above, the Court does so again here. Since the Court is not aware of any ways in which DeSimone's "interests are antagonistic to the interest of other members of the class," *Baffa*, 222 F.3d at 60, Plaintiffs have likely met their burden of demonstrating that she is an adequate representative, with the caveat that the Court cannot say so conclusively before the classes are adequately defined.

As to proposed class counsel, SPS does not argue that DeSimone's attorneys are inadequate to conduct this litigation. (*See generally* Def.'s Class Cert. Opp'n, Dkt. 207.) Indeed, Plaintiffs' proposed co-lead class counsel includes three firms with extensive experience in class action litigation. (*See* Pls.' Class Cert. Decl., Dkt. 183-1; Pls.' Class Cert. Decl. Exs. A–C ("Firm Biographies"), Dkts. 183-2–183-4.) Having reviewed proposed class counsel's joint declaration, the Court concludes that the proposed class counsel is likely to "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4); (*see generally* Pls.' Class Cert. Decl., Dkt. 183-1, ¶¶ 8–38 (describing proposed class counsel's experience and work on this case)).

### 5. Rule 23(b)(3) and Ascertainability

Plaintiffs seek certification under Rule 23(b)(3), (*see* Pls.' Class Cert. Mem., Dkt. 183, at 16), which is appropriate for class actions that seek individualized money damages, *see Wal-Mart*, 564 U.S. at 362 ("[I]ndividualized monetary claims belong in Rule 23(b)(3)."). In addition to meeting Rule 23(a)'s requirements, plaintiffs seeking certification of a damages class under Rule 23(b)(3) must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," i.e., predominance, and (2) "a class action

47

is superior to other available methods for fairly and efficiently adjudicating the controversy," i.e., superiority. *See* Fed. R. Civ. P. 23(b)(3).

"The 'predominance' requirement of Rule 23(b)(3) 'tests whether [the] proposed classes are sufficiently cohesive to warrant adjudication by [collective] representation.'" *Myers v. Hertz Corp.*, 624 F.3d 537, 547–48 (2d Cir. 2010) (quoting *Amchem*, 521 U.S. at 623).  Its purpose is to "ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (citation modified) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007)). The predominance requirement overlaps with the Rule 23(a)(2) commonality requirement, but is "far more demanding." *Amchem*, 521 U.S. at 624; *see also* 2 Rubenstein, *supra*, § 4:51 (5th ed. Dec. 2025) (the predominance inquiry requires "not just that common issues exist," but also that they "are more prevalent than non-common issues").  Still, "individual questions need not be absent.  The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Sykes*, 780 F.3d at 81 (citation modified).

The superiority requirement is aimed at determining whether a class action is "a superior means of adjudication." *Id.* at 82 (quoting 2 Rubenstein, *supra*, § 4:72).  The superiority inquiry is guided by four factors set forth in Rule 23(b)(3)'s subparagraphs:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

48

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D); *see also Sykes*, 780 F.3d at 82 ("[W]hile these factors, structurally, apply to both predominance and superiority, they more clearly implicate the superiority inquiry.").

In addition to the express requirements of Rule 23, courts within the Second Circuit have recognized an "implied requirement of ascertainability." *See Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015); *Initial Pub. Offerings*, 471 F.3d at 30. "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (citations and internal quotation marks omitted). "[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 257 (2d Cir. 2017).[35]

Here, there are problems with Plaintiffs' proposed class definitions that leave the Court unable to conclude that the classes are ascertainable, that common issues predominate, or that the class action mechanism is superior to individualized adjudication. For instance, Plaintiffs' theories of liability all rely on the assumption that class members have uniform mortgage agreements. (*See* Pls.' Class Cert. Mem., Dkt. 183, at 18–20 (describing common proof for class-wide claims based on assumption that class members have "uniform mortgage agreements").) But their proposed class definitions are not limited to borrowers with such uniform mortgage agreements. (*See id.*

---

[35] Ascertainability overlaps with the requirement of Rule 23(c)(1)(B), which states that a court's order certifying a class must "define the class." *See* Fed. R. Civ. P. 23(c)(1)(B); *see also* 3 Rubenstein, *supra*, § 7.27 (6th ed. Dec. 2025) (explaining that a class definition per Rule 23(c)(1)(B) must be "ascertainable").

at 2.)[36]  For example, in describing the classes, Plaintiffs state that "Plaintiffs and *nearly all* Class members signed 'uniform' mortgage agreements."  (*Id.* at 4 (emphasis added).)  On its face, this statement concedes that the class definitions include at least some borrowers who do not have uniform mortgage agreements.  Without this uniformity limitation as part of the class definitions, the Court cannot conclude that common issues predominate or that class-wide adjudication is feasible, because determining liability would require separately interpreting each non-uniform contract.  *See U.S. Foodservice*, 729 F.3d at 124 ("[C]ourts properly refuse to certify breach of contract class actions where the claims require examination of individual contract language." (collecting cases)).[37]

Furthermore, the proposed classes are not adequately tied to specific claims and class periods.  For example, it is unclear to the Court what claims Plaintiffs intend to bring through the proposed Upcharge Class, or what the class period is.  Regarding the class period for the proposed Breach of Contract Class, Plaintiffs state only that "the class period corresponds to the state where the property is located."  (*See* Pls.' Class Cert. Mem., Dkt. 183, at 2.)  But without a more specific indication of the class period applicable in each state, the Breach of Contract Class is insufficiently defined, and it is unclear how the Court could direct proper notice to the putative class members in all 50 states.  *See* Fed. R. Civ. P. 23(c)(2)(B) (for class actions under Rule 23(b)(3), requiring the Court to direct "the best notice that is practicable under the circumstances" including "the

---

[36] It is also unclear whether Plaintiffs intend to limit the classes to borrowers with "conventional" (i.e., non-GSE) loans.

[37] Additionally, Plaintiffs have not presented evidence to demonstrate how the Fannie Mae/Freddie Mac Uniform Instruments vary by state and whether those variations are material to their claims, nor have they presented evidence about potentially material modifications to the Fannie Mae/Freddie Mac Uniform Instruments over time.  (*See, e.g.*, SAC, Dkt. 160, ¶ 60 (acknowledging that "Plaintiff DeSimone's mortgage agreement was twice modified" but claiming that "neither Sections 7 nor 9 in her original mortgage agreement were modified").)

definition of the class certified" and "the class claims, issues, or defenses" in "plain, easily understood language"). It is also unclear whether Plaintiffs intend for the proposed Breach of Contract Class to incorporate both their claim for breach of contract *and* their alternative claim for breach of the implied covenant of good faith and fair dealing. (*See generally* Pls.' Class Cert. Mem., Dkt. 183.)

As to the proposed FDCPA Class, Plaintiffs' proposed definition does not limit the class to borrowers whose loans were in default at the time SPS began servicing them, which this Court has held is the test to determine when SPS was acting as a "debt collector" and thereby subject to liability under the FDCPA. *See Evans*, 2020 WL 5848619, at *9 (quoting *Zirogiannis*, 221 F. Supp. 3d at 302). Instead, the class is limited to borrowers to whom SPS "stated in letters when [it] began servicing the loan[s] that the loans were in default or past due." (Pls.' Class Cert. Mem., Dkt. 183, at 2.) But Plaintiffs do not define, under that theory, *how soon* after it began servicing the loan SPS must have sent such a letter.

These ambiguities, individually and collectively, prevent the Court from being able to conclude that the classes are ascertainable. *See* Manual for Complex Litigation (Fourth) § 21.222 (2004) ("Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action.").

Finally, Plaintiffs' motion for class certification lacks an adequate choice-of-law analysis. "Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" *Amchem*, 521 U.S. at 613 (first quoting 28 U.S.C. § 2072(b); and then citing Fed. R. Civ. P. 82). In other words, the class action mechanism cannot deprive litigants

51

(including absent class members) of the right to have the appropriate substantive law govern their claims.  Therefore, before certifying a nationwide class as Plaintiffs request, the Court has a duty to conduct a choice of law analysis.  To that end, Plaintiffs' motion is of little assistance.

Plaintiffs' claims for breach of contract and violation of the implied covenant of good faith and fair dealing arise from state law.  Plaintiffs seek to certify nationwide classes for these claims (although Plaintiffs' proposed classes do not clearly incorporate the implied covenant claim, as discussed *supra*).  The Court must consider how the applicable state laws differ, and any significant differences may "affect the feasibility and purported benefit of trying [the] claims on a classwide basis." *Nextel Commc'ns*, 780 F.3d at 147.  But Plaintiffs do not provide a choice-of-law analysis, nor do they survey the applicable substantive state law.  They have therefore not met their burden of demonstrating that the Rule 23(b)(3) requirements of predominance and superiority are met. *See U.S. Foodservice*, 729 F.3d at 127 ("Nationwide class action movants must credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." (citation modified) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986))).[38]

---

[38] To be sure, the fact that some of Plaintiffs' claims arise from state law does not preclude a nationwide class from being certified. *See Nextel Commc'ns*, 780 F.3d at 147 ("[T]he fact that contract terms must be interpreted according to multiple different state laws does not *necessarily* make individual issues predominate over common ones . . . ." (emphasis added)).  But the issue must be addressed, and Plaintiffs' motion in its current form does not help the Court address it. *Cf. U.S. Foodservice*, 729 F.3d at 127 (holding that the district court "did not abuse its discretion in determining that variations in state contract law [did] not preclude certification" because "plaintiffs' papers in support of their motion for class certification demonstrate[d] that all the relevant jurisdictions" had adopted the same relevant standards).

*    *    *

Although a hearing is normally a "routine part of the certification decision," *see* Manual for Complex Litigation (Fourth) § 21.21 (2004), the Court has "ample discretion" to circumscribe proceedings on class certification where appropriate, *Initial Pub. Offerings*, 471 F.3d at 41.  Here, the Court finds that a hearing would not be an appropriate use of the parties' or the Court's time in light of its conclusion that Plaintiffs' motion for class certification cannot be granted in its current form.  While the Court could address some of the issues with the proposed class definitions by modifying them *sua sponte*, *see Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 267 (E.D.N.Y. 2016), it is not "obligated" to do so "on its own initiative," *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993).  Rather, the number of outstanding questions militates towards allowing Plaintiffs to "propose an alternative construction in the first instance."  *Royal Park Invs. SA/NV v. Bank of N.Y. Mellon*, No. 1:14-CV-6502 (GHW), 2017 WL 3835339, at *5 (S.D.N.Y. Aug. 30, 2017).  Therefore, the Court finds it appropriate to allow Plaintiffs to reformulate the proposed classes and resubmit their motion for class certification.  *See Royal Park Invs.*, 2017 WL 1331288, at *9 (collecting cases).  If they do so, the Court will thereafter reassess whether to hold a hearing on the certification motion.

## CONCLUSION

For the reasons stated above, SPS's motion for summary judgment, (Dkt. 187), is denied. Plaintiffs' motion for class certification, (Dkts. 183, 191), is denied without prejudice to amend and re-file.  Plaintiffs may amend and re-file their motion for class certification within thirty (30) days of this Memorandum & Order.  If Plaintiffs do so, SPS will have thirty (30) days thereafter to respond, and Plaintiffs will have seven (7) days to reply.  The parties are encouraged to follow the Court's Individual Rule 3(D), which describes the Court's bundling preferences.  The deadline for the parties to submit a proposed pretrial order in accordance with the Court's Individual Rule 4(A) is adjourned *sine die* pending the resolution of Plaintiffs' class certification motion.

This Memorandum & Order will be filed on a restricted basis to allow the parties fourteen (14) days to object to the disclosure of any portion of the Memorandum & Order.  Any objections must justify the need for the continued redaction under the applicable legal standards and may be filed under seal.  If no such objections are timely filed, the Memorandum & Order will be made public in its entirety.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated:  March 31, 2026
        Brooklyn, New York

54